**STATE OF TENNESSEE**
**Department of Commerce and Insurance**
**500 James Robertson Parkway**
**Nashville, TN 37243-1131**
**PH - 615.532.5260, FX - 615.532.2788**
**Jerald.E.Gilbert@tn.gov**

May 11, 2016

Southern Trust Insurance Company
P O Box 250
Macon, GA  31297
NAIC # 12610

Certified Mail
Return Receipt Requested
7015 0640 0007 0043 4658
Cashier # 25746

Re:   Northend Investors, Llc   V.   Southern Trust Insurance Company

Docket # 16042-3

To Whom It May Concern:

Pursuant to Tennessee Code Annotated § 56-2-504 or § 56-2-506, the Department of Commerce and Insurance was served May 9, 2016, on your behalf in connection with the above-styled proceeding. Documentation relating to the subject is herein enclosed.

Jerald E. Gilbert
Designated Agent
Service of Process

Enclosures

cc: Circuit Court Clerk
     Henderson County
     Courthouse, Main Street
     Lexington, Tn 38351

| Henderson County<br>Circuit Court<br>Lexington, TN | **STATE OF TENNESSEE**<br>**CIVIL SUMMONS**<br>page 1 of 1 | Case Number<br>16cv42-3 |
|---|---|---|
| | NORTHEND INVESTORS, LLC    vs.    SOUTHERN TRUST INSURANCE COMPANY | |

Served On:

Southern Trust Insurance Company    c/o Commissioner of Insurance
500 James Robertson Parkway
Nashville TN 37243-0565

You are hereby summoned to defend a civil action filed against you in ___Circuit___ Court, ___Henderson___ County, Tennessee. Your defense must be made within thirty (30) days from the date this summons is served upon you. You are directed to file your defense with the clerk of the court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action by the below date, judgment by default may be rendered against you for the relief sought in the complaint.

Issued: April 29, 2016

Clerk / Deputy Clerk

Attorney for Plaintiff: J. Brandon McWherter, Gilbert Russell McWherter Scott Bobbitt PLC
341 Cool Springs Blvd., Ste. 230, Franklin TN  37067; ph: 615-354-1144

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S): Tennessee law provides a ten thousand dollar ($10,000) personal property exemption as well as a homestead exemption from execution or seizure to satisfy a judgment. The amount of the homestead exemption depends upon your age and the other factors which are listed in TCA § 26-2-301. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for your self and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Please state file number on list.

Mail list to _____, _____ Clerk, _____ County
_____

### CERTIFICATION (IF APPLICABLE)

I, _____, _____ Clerk of _____ County do certify this to be a true and correct copy of the original summons issued in this case.

Date: _____     _____
                                              Clerk / Deputy Clerk

**OFFICER'S RETURN:** Please execute this summons and make your return within ninety (90) days of issuance as provided by law.

I certify that I have served this summons together with the complaint as follows: _____
_____

Date:_____     By:_____
                                              Officer, Title

**RETURN ON SERVICE OF SUMMONS BY MAIL:** I hereby certify and return that on _____, I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in the above styled case, to the defendant _____. On _____ I received the return receipt, which had been signed by _____ on _____. The return receipt is attached to this original summons to be filed by the Court Clerk.

Date: _____

_____     _____
Signature of Plaintiff                                    Notary Public / Deputy Clerk (Comm. Expires _____)

                                              Plaintiff's Attorney (or Person Authorized to Serve Process)
                                              (Attach return receipt on back)

ADA: If you need assistance or accommodations because of a disability, please call _____, ADA Coordinator, at ( ) _____.

Rev. 03/11

IN THE CIRCUIT COURT OF HENDERSON COUNTY, TENNESSEE
AT LEXINGTON

**NORTHEND INVESTORS, LLC,**

      **Northend,**

v.                                                     Docket No: 16042-3

                                                          **JURY DEMANDED**

**SOUTHERN TRUST INSURANCE
COMPANY,**

      **Defendant.**

## COMPLAINT

COMES NOW the Plaintiff, Northend Investors, LLC, by and through counsel, and submits the following for its Complaint against Southern Trust Insurance Company:

### PARTIES AND JURISDICTION

1. Northend Investors, LLC (hereafter "Northend") is a Tennessee limited liability company with its principal office located at 211 Commerce Street, Suite 300, Nashville, Tennessee. At all times relevant hereto, Northend was the owner of the structure located at 15365 Highway 22 North, Lexington, Tennessee (the "Insured Premises").

2. Defendant, Southern Trust Insurance Company (hereafter "Southern Trust"), is an insurance company engaged in the insurance business in the State of Tennessee, including Henderson County. Southern Trust's principal office is located in Macon, Georgia.

3. This Complaint originates as the result of a fire that caused substantial insured losses to the structure located on the Insured Premises, and Southern Trust's failure and refusal to promptly and fully pay Northend's insurance claim.

## FACTS

4. At all times relevant hereto, Northend was the insured in an insurance contract whereby Southern Trust agreed to insure the commercial building located at the Insured Premises against property damage, upon information and belief bearing Policy No. CPP 1003425 (the "Policy"). As relevant hereto, the Policy's term was August 2, 2014 to August 2, 2017. The Policy is incorporated herein by reference as if set forth verbatim.

5. At all times relevant hereto, the Insured Premises consisted of a commercial building and surrounding area, which Northend leased to a third party. The building is comprised of both warehouse and office space.

6. The Policy provided insurance coverage for direct physical loss to the building located on the Insured Premises and such other insurance coverage as specifically set forth in the Policy.

7. The Declarations page of the Policy reveals that insurance coverage was provided for the building located on the Insured Premises in the amount of $2,834,657.00, subject to an automatic inflation guard increase percentage of four percent (4%).

8. As defined by the Policy, the insurance coverage provided for the "building" located on the Insured Premises included the building itself and also completed additions, fixtures, permanently installed machinery and equipment, and personal property owned by Northend that was used to maintain or service the building.

9. The Policy was an "all-risks" policy, meaning that the Policy covered all risks of direct physical loss or damage except for those specifically excluded or limited by the Policy.

10. Pursuant to the Policy, Northend paid an annual premium to Southern Trust in exchange for insurance coverage. Northend paid the required premiums at all times relevant to this Complaint.

11. On or about February 4, 2015, an accidental fire occurred at the building located on the Insured Premises, resulting in substantial direct, physical loss (the "Loss").

12. Northend promptly reported the Loss to Southern Trust.

13. Northend fulfilled all of the duties after the Loss that were imposed upon it by the Policy to the satisfaction of Southern Trust.

14. As it relates to the Loss, there is no applicable exclusion. The Loss is a compensable claim under the Policy.

15. Southern Trust has acknowledged that the Loss is a compensable claim.

16. Despite the fact that Northend has fulfilled all duties imposed upon it by Southern Trust and is at no fault in this matter, Southern Trust has wrongfully refused to fully and promptly pay Northend's claim for insurance proceeds.

17. Southern Trust has not made any payments to Northend.

18. After the Loss, Southern Trust assigned sent an adjuster, Ted Kiesler with Vericlaim, to the Insured Premises to scope and estimate the Loss. Mr. Kiesler inspected the Insured Premises on February 12, 2015. On February 13, 2015, Mr. Kiesler advised Southern Trust that the fire started at a light fixture, causing hot/melting debris to fall and creating a smoldering fire that engulfed the entire facility in smoke. On that same date, Mr. Kiesler also stated to Southern Trust:

> The warehouse, 60,000sf, has extensive smoke damages and the smoke has damaged vinyl backed ceiling and wall insulation. Initial discussions is the smoke has permeated the insulation and it needs replaced.

. . .

We have set our initial estimate of loss at $500k.

Mr. Kiesler also suggested to Southern Trust that an independent bid be obtained for the warehouse repairs.

19.     A week later, on or about February 19, 2015, Mr. Kiesler re-inspected the Insured Premises with a Memphis contractor, Dave Robbins of Sharp & Robbins Construction. Mr. Jon Ayers of Northend and Roy Cook with Southern Trust were also present.

20.     On February 25, 2015, Dave Robbins of Sharp & Robbins Construction inspected the Insured Premises a second time, during which a test cut was taken of the warehouse insulation to determine if smoke and soot had permeated the insulation.  Mr. Robbins concluded that the insulation must be removed and replaced and that other significant restoration work was necessary to remediate the smoke and soot damage.  Mr. Robbins also recommended to Southern Trust that an electrical contractor be retained to inspect the electrical system and to make recommendations for the repairs/replacement necessitated by the smoke and soot exposure.

21.     On March 1, 2015, Mr. Kiesler (the adjuster assigned to the loss by Southern Trust), sent Southern Trust photographs showing a test area of the removed insulation. The photographs showed that smoke and soot had permeated the insulation. Accordingly, Mr. Kiesler advised Southern Trust that "we may have a hard sell on just cleaning," and suggested that an environmentalist/hygienist be considered.

22.     Southern Trust declined to engage a hygienist and instead decided to only clean the warehouse that was covered in smoke and soot, without removal or replacement of any of the damaged insulation or other structural components. Southern Trust also declined to allow an electrical contractor to inspect as suggested by Sharp & Robbins and Mr. Kiesler.

23. The independent contractor engaged by Southern Trust, Sharp & Robbins, disagreed with the methodology and scope of repairs insisted on by Southern Trust, and therefore declined any further involvement. Sharp & Robbins knew that the cleaning proposed by Southern Trust would not properly remediate the Insured Premises, and it did not want the liability of performing work it knew would not resolve the problem.

24. In March 2015, Northend notified Southern Trust it would not agree to just a cleaning of the warehouse and that significant repairs/replacements were necessary.

25. By July 2015, Southern Trust had not made any payments to Northend so Northend contacted ServiceMaster, a restoration contractor engaged by Southern Trust, to request an update. ServiceMaster advised that the insurance company had only approved cleaning, with no repairs. Specifically, ServiceMaster indicated that the insurance company had set reserves at $150,000 for the cleaning the interior of the structure.

26. On July 27, 2015, Northend sent Southern Trust and Vericlaim the following email:

> I received an email from Kathy Cox at Servicemaster on July 13 indicating that Southern Trust has approved $150,000 to clean the interior of the structure. According to Kathy, this is only for cleaning with no repairs. I may or may not utilize Servicemaster to accomplish the necessary repairs/replacement/cleaning and although I'm not an expert, I doubt that $150,000 is even close to enough to accomplish the necessary repairs. In order for me to consider whether cleaning in lieu or repair/replacement is appropriate, I'd ask that you please send me: (1) all estimates you've received to date; and (2) a detailed itemization that details what exactly the $150,000 for cleaning is expected to accomplish.
>
> Please also send payment for all amounts that are undisputed so that I can get started in trying to repair the damage. We're now 6 months after the loss and I'm still awaiting payment. If you need anything from me in order to process the payment, just let me know. I look forward to hearing back from you.
>
> Thanks, Jon

5

27. Southern Trust, through its adjuster Roy Cook, responded on July 28, 2015 as follows:

> Jon,
> Southern Trust Insurance is only authorizing cleaning of the warehouse just like the office area. The pre-existing damages to the building will not be addressed. The only other covered damages are the window damaged by the fire department and the thermostat that melted. If you wish to use another vendor for the cleaning that's fine, just have them forward their proposal. Since ServiceMaster was already working the mitigation we did not receive any bids.
> Thanks,
> Roy Cook

28. The next day, on July 29, 2015, Northend sent Southern Trust the following email:

> Mr. Cook,
>
> Thanks for the prompt response. I disagree that cleaning will resolve all the damages caused by the fire. What are my options for resolving this issue? Also, what pre-existing damages you are referring to? This is the first I've heard of that. I'm obviously not making a claim for pre-existing problems - - just the damage caused by the fire, smoke, soot, etc.
>
> Please go ahead and send the undisputed $150,000.
>
> Thanks, Jon

29. Southern Trust responded on July 30, 2015 as follows:

> Jon,
> The smoke / soot are the only covered damage. The pre-existing damage is the open vinyl insulation damaged manufacturing wear & tare (*sic*). This was discussed when we inspected the building with you. The $150,000 is the reserve set for the claim and we have already paid $55,765.60 for the office mitigation. Payments are made once the repairs are completed. The smoke damage to the warehouse is minor; it's only the volume that makes it a large claim. I'll ask management if a settlement amount can be offered to close the claim.
> Roy Cook

30. On July 21, 2015, Northend replied as follows:

Mr. Cook,

Thanks for the info. Just so I am clear, are you saying that I'm not entitled to any payment at all unless repairs are done? I thought the policy would pay a certain amount before repairs and then more when repairs are done. It looks like I am mistaken, but if you could confirm how that works for me I would appreciate it. If I'm entitled to any payment before any repairs or cleaning is accomplished, I'd like you to send that.

On the "office mitigation" you mentioned, I had nothing to do with that. The tenant quickly ordered the cleanup so they could get their workplace back up and running as soon as possible after the fire. It was my understanding the tenant was dealing with its insurance company (Auto Owners, I think) on the office cleanup and their contents. I haven't been involved at all in that process and was not aware Southern Trust was involved either. I do know, however, that the tenant is still having some issues with soot and smoke smell though.

It's been six months since the fire and my building is still a sooty, smelly mess so I'd like to get this resolved as soon as possible.

31. On July 31, 2015, Southern Trust sent the following email to Northend:

Mr. Ayers,
Fire and water mitigation is paid directly to the vendor for services when completed; the tenant is still having issues with the soot because ServiceMaster and the bank are still going thru the warehouse contents. You mentioned not having ServiceMaster do the warehouse mitigation and I requested any proposals from your mitigation vendors but I haven't seen anything. Southern Trust Insurance Co. is open to a cash settlement with release if offered.
Thanks,
Roy

32. Northend responded to Mr. Cook on August 3, 2015:

Mr. Cook,

I'd like for Southern Trust to pay all undisputed amounts. I just can't believe that my policy requires that all insurance proceeds be paid to a vendor. What would happen if I decided to not do any cleaning? Are you saying I wouldn't

7

> be entitled to anything? Don't get me wrong – I intend to fully repair the property but it doesn't seem Southern Trust should be able to force me to clean only when I don't even think that will put my property back to the way it was before the fire.
>
> I don't have a written estimate from anyone, including ServiceMaster - - just a reference to a $150,000 reserve from you and I don't even know what that means. I'd like for you to send whatever estimate you have that you based the "$150,000 reserve" on and then pay that amount. In the meantime, I'll work on getting another bid for the necessary repairs. Also, if you have any reports or estimates from vendors you've had look at the electrical system or exterior walls and the proper way to remedy the damage, I'd appreciate the opportunity to review that.

33. On August 4, 2015, Mr. Cook with Southern Trust responded:

> Jon,
> There is no damage to the electrical except for the thermostat and no covered damage to the exterior walls except for cleaning. If you want to clean the building please provides a proposal and we will review it. Again, there's no structural damage covered on this claim. Also the $150,000 is a reserve amount insurance company's put in place to have funds available if needed. If you decide not have the building cleaned Southern Trust may offer a settlement amount, just let me know.
> Thanks,
> Roy Cook

34. That same day, on August 4, 2015, Northend replied as follows:

> Again, please send me all estimates and reports from your experts/vendors so I can review them.

To which Southern Trust responded on the same day:

> Service Master has already sent you everything.

35. It was not true that ServiceMaster had sent Northend "everything." In fact, ServiceMaster has not sent Northend anything except for a statement that there was a reserve of $150,000 set for cleaning. ServiceMaster did not provide Northend any estimate for the work. Accordingly, on August 5, 2015, Northend emailed Southern Trust, as follows:

8

> Mr. Cook,
>
> The only thing I've received from Servicemaster is Kathy's email of July 13 advising that there was a $150,000 reserve for cleaning. I have not received any formal estimate from Servicemaster, nor have I received reports or estimates from the other people you sent out to inspect. Please send those.

36. The next day, Southern Trust falsely advised that no estimates were required, as follows:

> Mr. Ayers,
> Since there is no structural damage to be repaired, only cleaning there is only calculated estimate for the mitigation. The smoke mitigation is largely labor hours and supplies. This is different from restoration where construction estimates are required. Also in the policy it is the insured's responsibility to mitigate their damages as best they can. Service Master has been on site from the beginning and if you want another vendor that is up to you.
> Thanks,
> Roy Cook

37. On August 25, 2015, Northend requested that Southern Trust provide it with a certified copy of the insurance policy in effect at the time of the Loss. Southern Trust ignored these requests, and refuses to provide Northend with a certified copy of the Policy. To date, Southern Trust has still failed and refused to provide Northend with a certified copy of the insurance policy in effect at the time of the Loss.

38. Also on August 25, 2015, Northend again requested in writing that Southern Trust make payment for the undisputed damages. Southern Trust refused, and still refuses, to make any payment to Northend.

39. Because Southern Trust refused to provide any documentation or evidence supporting its position on the nature, extent, and amount of the Loss, Northend engaged an expert,

Thomas Irmiter of Forensic Building Science, to inspect the building, test for soot, and to determine the proper scope and methodology for repairs.

40. Based on the inspection and testing, Mr. Irmiter determined that the cleaning undertaken to date by ServiceMaster was deficient and did not address deposits of soot into wall, ceiling and floor cavities or openings in mechanical chases, conduit runs and behind exposed insulation in the warehouse. The soot sampling performed revealed deposits of soot on exposed surfaces, inside wall, ceiling, and floor cavities, and in open electrical boxes. The fire caused substantial damage to the building through the deposits of carcinogenic soot into hidden wall, ceiling and floor cavities and the soot is still present in the ambient air. Accordingly, the proper scope of repairs includes, but is not limited to, removal of all wall and ceiling finishes, exposed warehouse wall and roof insulation, HVAC equipment, cavity insulation and conduit with any openings in order to expose the wood and steel framing members for purposes of proper cleaning to remove the soot and seal all porous wood materials. Additionally, the electrical system was damaged by the soot and must be replaced per a licensed electrician engaged by Northend. A detailed report and necessary scope of work was provided to Southern Trust.

41. On October 10, 2015, Northend provided the expert reports to Southern Trust which proved that soot was in the wall cavities, conduits, etc. and that significant restoration work was necessary. On October 21, 2015, Southern Trust responded:

> Sorry for the delay I have been out of town until today. We do not agree with the scope, it doesn't take the pre-existing condition of the property and prior damages. It also contradicts Service Masters scope for cleaning only. We are sending Belfor out to out to do an inspection and pull the manufacturing history of the building. I will forward it to you when it is complete.
> Thanks,
> Roy

That same day, Northend responded:

10

> Why don't you send Sharp and Robins back out since they've already been there. I can coordinate an inspection between them and our building consultant. If you insist on Belfor, then please coordinate the scheduling of their visit through me so we can schedule it at an agreeable time.
>
> Service Master did no testing and did not come up with the scope – the scope was dictated by Southern Trust.
>
> Also, what pre-existing conditions and damage are you referring to? We're talking about soot, which certainly wasn't there before.

42. On October 21, 2015, Northend also sent its experts' reports to Mr. Kiesler (the independent adjuster previously assigned by Southern Trust to scope and estimate the Loss). Because Northend's experts' conclusions were the same as previously indicated by Sharp & Robbins and Mr. Kiesler, Northend requested an onsite meeting with Sharp & Robbins to determine if an agreement could be reached as to the scope and amount of the loss. Mr. Kiesler indicated that he could only follow instructions from Roy Cook at Southern Trust, and thus he declined to communicate with Northend absent permission of Southern Trust. Additionally, Roy Cook at Southern Trust refused to authorize Mr. Kiesler to talk or otherwise communicate with Northend.

43. On November 16, 2015, Southern Trust re-inspected the Insured Premises with various consultants. Southern Trust refused to communicate with Northend's experts while onsite and even attempted to ban Northend's expert from being present. While there on November 16, 2015, one of Southern Trust's consultants took samples for soot testing, which were sent to a laboratory. Southern Trust has refused to provide the analytical data produced by the testing laboratory. Initially, Southern Trust directed Northend to the laboratory to make a direct request, but then later instructed the laboratory to not release the data to Northend. Instead, Southern Trust told Northend to "hire [its] own forensic engineers. We will not provide the underlying data. Our engineer's report speaks for itself."

11

44. On December 3, 2015, Northend submitted a sworn proof of loss to formalize its claim. The proof of loss was in the amount of $2,570,070.39, and was accompanied by two supporting estimates. The proof of loss was equal to the amount of the lower of the two estimates.

45. Southern Trust's failure and refusal to pay Northend the amounts owed to it for the Loss is without justification, and was intentional, fraudulent, malicious and/or reckless.

46. Southern Trust's failure and refusal to pay the money and benefits due and owing Northend under the Policy has caused Northend to initiate this Complaint to recover the insurance proceeds to which it is entitled.

## CAUSES OF ACTION

### Count 1 – Breach of Contract

47. The allegations contained in Paragraphs 1-46 of this Complaint are incorporated herein by reference as if set forth verbatim.

48. The Policy issued by Southern Trust is a binding contract, and is supported by valid consideration.

49. Southern Trust is in total material breach of the Policy, and Southern Trust is liable to Northend in the maximum amount allowed by the Policy for the Loss. Specifically, Southern Trust's breach of contract includes the following, without limitation: (a) Southern Trust's failure and refusal to pay the amounts owed to Northend for the Loss under the Building coverage afforded by the Policy; and (b) Southern Trust's failure and refusal to pay such other amounts to Northend as may be required by the Policy.

50. As a result of Southern Trust's breach of contract, Northend has sustained substantial compensable losses for the amounts claimed under the Policy.

51. Southern Trust is liable to Northend for its losses.

52. Southern Trust's breach of contract was intentional, fraudulent, malicious, and/or reckless, therefore justifying an award of punitive damages. *See, e.g., Riad v. Erie Ins. Exchange*, 436 S.W.3d 256, 276 (Tenn. Ct. App. Oct. 31, 2013). Specifically, Southern Trust intentionally, fraudulently, maliciously, and/or recklessly: (1) failed to effectuate a prompt and fair settlement of Northend's claim when liability was reasonably clear; (2) refused and failed to conduct a reasonable, prompt, and fair investigation concerning the issues surrounding Northend's claim for insurance proceeds; (3) unjustly refused and/or failed to pay Northend's claim for its own financial preservation with no reasonable or justifiable basis; (4) refused payment on Northend's claim for no valid reason whatsoever; (5) failed to treat Northend's interests with equal regard to its own; (6) promised prompt action and claim-handling but then failed to provide any payment or even any prompt communication or status reports; (7) failed and refused to pay the undisputed portions of Northend's claim; (8) failed to timely investigate, scope, and estimate the Loss; (9) knew the true facts that the Insured Premises was damaged to the extent that structural repairs/replacement were necessary but falsely represented to Northend that only cleaning was needed; (10) lied to Northend by advising that only cleaning was needed when Southern Trust knew from its independent adjuster and contractor that it hired that cleaning would not resolve the soot infestation; (11) refused to provide Northend with a certified copy of its insurance policy despite many written requests for same; (12) actively instructed its independent adjusters and vendors to refuse to communicate or provide information to Northend; (13) concealed important and material facts from Northend in an effort to minimize the amount Southern Trust would have to pay on the claim; (14) misrepresented relevant facts and policy provisions to Northend; (15) failed to adopt and implement reasonable standards for the prompt investigation and settlement of claims; (16) forced Northend to file suit to enforce its rights under the Policy; and (17) such other facts and

circumstances as alleged in this lawsuit and/or to be determined during discovery and which will be shown at trial. Southern Trust knew, or reasonably should have known, that Northend was justifiably relying on the money and benefits due it under the terms of the Policy. Nevertheless, acting with conscious disregard for Northend's rights and with the intention of causing or willfully disregarding the probability of causing unjust and cruel hardship on Northend, Southern Trust consciously ignored Northend's valid claim and then denied Northend's claim and withheld monies and benefits rightfully due Northend. Northend seeks, and is entitled to, punitive damages.

WHEREFORE, as a result of the foregoing, Northend would respectfully request that this Honorable Court award a judgment to Northend as follows:

A. For compensatory damages to Northend against Southern Trust not to exceed $3,250,000.00;

B. For punitive damages against Southern Trust in an amount to be determined appropriate by the jury but not to exceed nine times the amount of compensatory damages awarded to Northend;

C. For all costs incurred by Northend as a result of this action;

D. For pre- and post-judgment interest; and

E. For such other further and general relief as this Court deems just and equitable.

## JURY DEMAND

Northend demands a jury.

Respectfully submitted,

**GILBERT RUSSELL McWHERTER SCOTT BOBBITT PLC**

*[signature]*

J. BRANDON McWHERTER #21600
bmcwherter@gilbertfirm.com
341 Cool Springs Blvd, Suite 230
Franklin, TN 37067
Telephone: (615) 354-1144
Facsimile: (731) 664-1540

CLINTON H. SCOTT #23008
cscott@gilbertfirm.com
101 North Highland
Jackson, Tennessee 38301
Telephone: (731) 664-1340
Facsimile: (731) 664-1540

*Attorneys for Northend Investors, LLC*

## COST BOND

This firm stands as surety for costs in this cause.

*[signature]*

GILBERT RUSSELL MCWHERTER
SCOTT BOBBITT PLC

15