## Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE WESTERN DISTRICT OF TENNESSEE
 3                     EASTERN DIVISION
 4   ------------------------------------------
 5   NORTHEND INVESTORS, LLC,
 6                  Plaintiff,
 7   vs.                  File No. 1:16-cv-01137 JDB-egb
 8   SOUTHERN TRUST INSURANCE COMPANY,
 9                  Defendant.
10   ------------------------------------------
11
12                    DEPOSITION OF
13                   NEIL G. CARLSON
14              Taken on April 7, 2017
15            Commencing at 12:57 p.m.
16
17
18
19
20
21
22
23
24      REPORTED BY:  NANCY G. GISCH, RMR, CRR, CLR
25
```

## Page 2

```
 1        The deposition of NEIL G. CARLSON,
 2   taken on April 7, 2017, commencing at
 3   approximately 12:57 p.m. taken at 24 East Fourth
 4   Street, St. Paul, Minnesota, before Nancy G.
 5   Gisch, Registered Merit Reporter, Certified
 6   Realtime Reporter, Certified LiveNote Reporter, a
 7   notary public in and for the State of Wisconsin.
 8
 9            A P P E A R A N C E S
10
11   On Behalf of the Plaintiff:
12        CLINTON H. SCOTT, ESQ.
13        cscott@gilbertfirm.com
14        Gilbert, Russell, McWherter, Scott,
15          Bobbitt, PLC
16        101 North Highland Avenue
17        Jackson, Tennessee 38301
18        731-664-1340
19
20
21
22
23   (Appearances continued on next page.)
24
25
```

## Page 3

```
 1   On Behalf of the Defendant:
 2        DAWN DAVIS CARSON, ESQ.
 3        dcarson@hickmanlaw.com
 4        Hickman Goza & Spragins, PLLC
 5        PO Box 16340
 6        Memphis, Tennessee 38186
 7        901-881-9840
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                 I N D E X
 2   WITNESS:  NEIL G. CARLSON                    PAGE
 3
 4   EXAMINATION BY MS. CARSON....................   5
 5   EXAMINATION BY MR. SCOTT.....................  73
 6
 7   EXHIBITS MARKED AND REFERRED TO:
 8   EXHIBIT 1....................................   5
 9        Notice to Take Deposition of
10        Neil Carlson
11   EXHIBIT 2....................................   5
12        1/29/17 letter to B. McWherter
13
14
15
16   (Original exhibits attached to original
17   transcript; copies to counsel.)
18
19
20
21
22
23
24
25
```

Page 5

1                    P R O C E E D I N G S

2

3        (Deposition Exhibits No. 1 and 2 marked.)

4                    NEIL G. CARLSON,

5   duly sworn, was examined and testified as follows:

6                    EXAMINATION

7   BY MS. CARSON:

8        Q.  Mr. Carlson, my name is Dawn Carson.  I

9   represent Southern Trust in this matter.

10           Could you please state your name.

11       A.  Full name?

12       Q.  Yes.

13       A.  Neil Geoffrey Carlson.

14       Q.  Okay.

15       A.  And it's G-E-O-F-F-R-E-Y.

16       Q.  And, Mr. Carlson, kind of go through the

17  deposition process.

18           I know, from reading your documents,

19  you've given several depositions before.  Should

20  be the same type of thing, maybe, except you

21  don't have such a thick southern accent, like I

22  do, in the other one.

23       A.  Okay.

24       Q.  But I'm going to be asking you questions.

25  If you don't understand me, need me to repeat it

Page 6

1   or rephrase it, please let me know.  I am not an

2   expert in soot or smoke, so I may say something

3   kind of strange, but please just correct me and

4   I'll try to fix that.

5           Also, at any time during the process if

6   you need to take a break -- you've got some

7   water, but if I can -- if you need to do that,

8   let me know.  I'll talk to Mr. Scott and we'll

9   make sure that you get a break.

10          I would request that if you take a break,

11  that you answer my question, unless there's some

12  objection that -- that's made.

13          If I ask a question, a yes-or-no answer --

14  please say yes or no and don't shake your head or

15  say uh-huh or huh-uh.

16          Can we agree to that?

17       A.  Yes.

18       Q.  Okay.  And, Mr. Carlson, we are here today

19  for a -- a case involving a fire that occurred at

20  15365 Highway 22 North, in Lexington, Tennessee.

21          Does that sound correct?

22       A.  Yes.

23       Q.  And the date of loss is February the 4th,

24  2015?

25       A.  Yes.

Page 7

1        Q.  Okay.  And you have your report in front

2   of you.  This is not a pop quiz.

3        A.  Okay.

4        Q.  You're welcome to refer to that --

5        A.  Thank you.

6        Q.  -- uh-huh -- as we go through it.

7           Now, I have today already made as

8   Exhibit 1 the notice to take deposition that we

9   have filed, where we had requested certain

10  documentation.  Plaintiff's counsel, I think, has

11  provided us certain document -- documentation

12  with exception to some objections pursuant to

13  federal rules.

14          The other document that I have provided

15  and made an exhibit -- to the court reporter --

16  is your report, which would be through -- 1

17  through 4.

18          And I understand that's your report that

19  you've provided.

20       A.  Yes.

21       Q.  Okay.  And your report is dated

22  January the 29th, 2017, is that correct?

23       A.  Yes.

24       Q.  And then, after that, your report -- and

25  I've just made it collective Exhibit 2 -- is your

Page 8

1   CV or resumé?

2        A.  Yes.

3        Q.  And that includes publications?

4        A.  At the end, yes.

5        Q.  Okay.  And then, also --

6        A.  Oh, yeah.  It -- I'm sorry, the deposition

7   was at the end.  The publications are included in

8   res -- residence, slash, CV.

9        Q.  And then at the very end are depositions

10  that have been taken of you or whether you have

11  provided court testimony, is that correct?

12       A.  Yes.  That -- yes.

13       Q.  Uh-huh.

14       A.  Back to 2005, that's correct, yes.

15       Q.  Are there any additional ones that -- that

16  you have completed or have been taken since this

17  was completed?

18       A.  No.

19       Q.  Okay.  And we've marked that as Exhibit 2.

20          Now, did you have a fee schedule?

21       A.  Yes.  I did.  I provided that to your

22  person.

23          MR. SCOTT:  Okay.  We emailed it

24  as --

25          MS. CARSON:  It was part of an email.

Page 9

1          MR. SCOTT:  No.  I mean, it was a --
2  email of what he charges per hour.  And --
3          MS. CARSON:  Okay.
4          MR. SCOTT:  -- it got forwarded on to
5  you this week.
6      Q.  (By Ms. Carson, continuing) And -- and,
7  also, I can -- as far as today, I would pay you
8  for your testimony time today.  And I actually
9  have a check, if you'll remind me at the end of
10  it, or, if you want to, send me a bill.  Either
11  one is fine.  And we can take care of that.
12  Okay?
13      A.  Thank you.
14      Q.  Now, what did you do to prepare for the
15  deposition today?
16      A.  I read through the -- all the -- I read
17  through the materials that were listed on the
18  basis of opinion that was listed here.  And then
19  I had some additional materials that I emailed to
20  your person, who you sent off -- I'm assuming --
21  to you.  And I reviewed those materials.
22      Q.  Okay.  I think some of the materials that
23  you were talking about were articles that you had
24  read, like, "Is soot the next asbestos?" and some
25  different articles like that.

Page 10

1      A.  Yeah, yes, to familiarize -- rize myself
2  more with the current thinking on it -- the
3  situation.
4      Q.  Okay.  How many times have you provided
5  testimony for soot-related cases?
6      A.  Soot-related cases -- this would be my
7  first one.
8      Q.  Okay.  Have -- have you provided any
9  testimony concerning smoke-related cases?
10      A.  Well, this would, again, be my first one.
11      Q.  Okay.  And I know smoke and soot are
12  different.
13          You agree?
14      A.  As I understand, the way they are
15  defining -- and I'm going to go away from just a
16  yes/no.
17          And the way they are defining it is that
18  the smoke would be the particles that would
19  remain airborne and soot would be the particles
20  that are deposited on surfaces.
21      Q.  That's my understanding, too.  And you
22  agree that soot is heavier than smoke?
23      A.  I would say, yes.
24      Q.  Okay.  All right.  And if you want to look
25  on the last page.  And we'll go over your

Page 11

1  deposition and trial testimony.
2      A.  This is the last page of the four-page --
3      Q.  The whole -- the whole document.
4      A.  That --
5      Q.  This right here.
6      A.  Oh, this one, yes.
7      Q.  Uh-huh.
8          Tell me what the Steve and Allison Gary
9  file is about.
10      A.  Let's see.  I want to make sure I got the
11  right one here.  Okay.
12          It was about a toilet.
13      Q.  Okay.  Was it dealing with a toilet
14  leaking and mold?
15      A.  Yes, it was.
16      Q.  And July of 2007, the Todd P. Johnson
17  case.  Do you remember what that was about?
18      A.  Yes.  That one involved whether the
19  clients or the builder properly drained the house
20  that was located on it.  And they had pictures of
21  standing water during the construction.  And I
22  was called in because of some mold growth that
23  had occurred on the premise.
24      Q.  Okay.  Curtis G. Marks?
25      A.  That was a large residential building

Page 12

1  where there were a -- construction defects and
2  mold growth that was associated with the
3  structure of the building.  That there was some
4  dispute whether the people that were selling the
5  Marks residence fully disclosed the nature of the
6  problems with the structural damage to the
7  building and the consequent mold growth.
8      Q.  Okay.  And it looks like in August 2015
9  you actually provided testimony for the defendant
10  as an expert witness, in Ralph Simon.
11          And what was that about?
12      A.  That was a client, Ralph Simon, who noted
13  cladosporium growth on the chamber of a bed.  And
14  he was claiming that the growth that was on the
15  chamber of the bed affected his health and that
16  it transported through the pieces of -- of the
17  chamber material through the tick, to the top of
18  the bedding.
19          And I did testing on that, showing that,
20  in this particular case, there wasn't enough
21  physical force from the person on the bed to
22  physically move the mold spores through all the
23  layers of the bedding.
24      Q.  Okay.  Now, these were cases, that we just
25  went over, where you gave testimony at deposition

Page 13

1  and trial.  Are there other cases where you've
2  been retained as an expert?
3      A.  It would be further back.  And my memory
4  isn't as -- as -- as good on the ones that are
5  previous to that.  We had a -- a -- a -- would a
6  mediation be considered a deposition or not?
7      Q.  Well, no.  Just -- I'm asking not so much
8  about where you had to actually talk, but
9  basically that you were retained as an expert to
10 provide information, like you did in this case,
11 but maybe they just didn't take your deposition.
12     A.  There -- would you consider workers' comp
13 cases?
14     Q.  Sure.
15     A.  Okay.  There was a workers' comp case at
16 the University of Minnesota alleging exposure to
17 ethylene oxide.  And the person was in an
18 adjacent building.  And they were attempting to
19 say that the discharge from an ethylene oxide
20 sterilizer got in and affected them.
21     Q.  Okay.
22     A.  There was another one where it was an
23 indoor air-related concern associated with an
24 occupant that was claiming that the environment
25 in her office was a source of aggravation for her

Page 14

1  health problems.  And I was called to testify on
2  behalf of the university on that.  And I had also
3  done previous work for her to attempt to
4  modify -- putting --
5      Q.  Bless you.
6      A.  -- HEPA filters in her office and --
7  et cetera.
8      Q.  Okay.
9      A.  Trying to think if there was any other
10 ones.  There may have been one more.  It would
11 have been a workers' comp case, but I don't
12 recall it.  And it was quite a while back.
13     Q.  Now, other than providing testimony
14 or -- or doing analysis, what other type of job
15 do you have?
16     A.  I have another job that's not affiliated
17 with the company that I am currently
18 representing, which is N.G. Carlson Analytical.
19 I work at the University of Minnesota.  And I am
20 a -- an industrial hygienist at that facility.
21 And I do emergency management response.  I do
22 ergonomic work.  I do indoor air investigations,
23 which in some cases has included a cleanup after
24 we've had fires and trying to figure out how to
25 clean up the space after we have had smoke and

Page 15

1  soot damage and -- and char damage.
2      And then chemical exposure monitoring.
3  Redesign of -- of exhaust system and then setting
4  up abatement projects for where we've had water
5  damage and there's mold and we have to design how
6  we're going to remediate it.  And then, also,
7  remediation and cleanup after water-damage events
8  from, for instance, a large flood.
9      Q.  Okay.
10     A.  That's the general part of it.
11     Q.  And at the University of Minnesota -- you
12 don't teach there.
13     A.  I am know an adjunct of -- instructor
14 there.  So I teach build -- college building
15 science class.  I've taught in a -- recently in a
16 con -- con -- home construction or a -- they are
17 doing forensic analysis of homes and how to
18 properly design them.  I've also taught
19 ergonomics classes, mold remed -- mediation class
20 for extension and ergonomics -- guest election
21 for ergonomics in human design and classes over
22 in St. Paul.  And then we've done mold
23 conferences -- mold remediation conferences
24 through the Minnesota extension department.
25     Q.  Okay.  And prior to -- I guess, let me ask

Page 16

1  this.  When did you begin your -- your business
2  and what did you say it was?  Neil G?
3      A.  N.G. Carlson Analytical.
4      Q.  Uh-huh.
5      A.  And I'll need to refer to my notes on that
6  one --
7      Q.  Okay.
8      A.  -- to exactly remember when it started.
9      I had done private consulting prior to
10 that.  And then I incorporated.  And I -- I've
11 got to find out when I incorporated here.
12     It's in here somewhere.  I'm sorry.
13     Q.  No.  That's okay.  I just couldn't find
14 it, either.
15     A.  Yeah, it's in here somewhere.
16     Q.  Okay.
17     A.  But I buried it, unfortunately, so I ...
18     Oh, here it is.  Additional professional
19 activities.
20     Q.  Oh, okay.
21     A.  So it's on -- it's not a numbered page,
22 which I apologize.
23     Q.  That's okay.
24     A.  It says -- and 1996 to present --
25     Q.  Okay.

Page 17

1   A.  -- is when -- when I've been doing that.
2   I did consulting, again, without -- without it
3   being an S corp prior to that and then
4   incorporated at that time.
5       Q.  Okay.  So from 1996 to now --
6       A.  Yes.
7       Q.  -- you've been, as far as doing activities
8   where you're doing analytical analysis through
9   N.G. Carlson -- and that would consist basically
10  of -- of what -- cases like what we're dealing
11  with now, where you are provided samples or you
12  take those samples and then you run analysis on
13  those to make a determination of what the
14  components are?
15      A.  Essentially that.  So in some cases I'm
16  providing just the laboratory work --
17      Q.  Uh-huh.
18      A.  -- which is -- in this case I'm providing
19  the laboratory work.  In other cases I will
20  actually go out and do the field investigation
21  and take a look and try to see if I can figure
22  out what's causing the -- the problem and the
23  situation.
24      And I think I disclosed in the other part
25  of it that the part dealing with soot and -- or

Page 18

1   the combustion and soot analysis has been since
2   September of 2011.
3       Q.  Okay.
4       A.  That was at the request of FBS.
5       Q.  And how many cases do you presently have
6   with FBS?
7       A.  Oh, gosh.  It's a -- ongoing or -- or
8   all -- all-inclusive?
9       Q.  Say within the last five years, how many
10  cases have you had with them?
11      A.  Our -- I'm going to have you clarify
12  "cases."
13      Q.  Uh-huh.
14      A.  Do you mean just projects that I'm working
15  on?
16      Q.  Let's call them projects, yeah?
17      A.  Okay, projects.
18      Q.  Uh-huh.
19      A.  Let's see.
20      I'm going to have to give you a rough
21  estimate of maybe between 100 to 150.
22      Q.  Okay.
23      A.  Maybe more than that, but it would just be
24  an estimate.  I'd have to go through all of
25  that -- and I have that --

Page 19

1       Q.  Sure.
2       A.  -- if you need that later.
3       Q.  No.  That's fine.
4       Now, as far as N.G. Carlson, where is it
5   located, your --
6       A.  It's --
7       Q.  -- the business?
8       A.  The business residence or the location
9   that is listed on the -- on the Secretary of
10  State [sic] as my home residence.
11      Q.  Okay.  And so where were you doing your
12  analysis?  Where is your lab?
13      A.  My lab is at least -- it's been at two
14  places.  I have used the University of Minnesota
15  lab in S 66 of Boynton Health Service.
16      More recently I purchased a microscope and
17  have been doing all of my work out of my
18  residence at 216 16th Avenue Southwest.
19      Q.  Okay.  And so for the case that we're here
20  for today, do you know where that testing was
21  performed?
22      A.  The testing was -- be -- that testing was
23  performed at the University of Minnesota Boynton
24  Health Service lab in S 66.
25      Q.  Okay.  And do you have, like, permission

Page 20

1   or rent it or how do you have the right to come
2   in there and use their lab?
3       A.  We are allowed, through the -- through --
4   I am an academic professional.  And we're allowed
5   to do work, outside consulting.  And then we
6   report that through reporting of outside
7   activities annually.  And we are allowed to use
8   facilities on it provided that any materials that
9   we consume will be -- we pay for.
10      Q.  Okay.  Now, when I took Mr. Irmiter's
11  deposition earlier, there was some discussion
12  concerning the labs of MicroVision and,
13  also -- is it E -- I'm going blank.  Hold on.
14          MR. SCOTT:  EMSL?
15          MS. CARSON:  EMSL, thank you.
16      Q.  (By Ms. Carson, continuing) -- EMSL.
17  There was some discussion about EMSL and
18  MicroVision and about some of the testing that
19  was performed, that EMSL and MicroVision and
20  possibly your testing was not consistent.
21      And do you know anything about that?
22      A.  Not -- not a lot.  I know that Tom had
23  been using both of those vendors.  They use
24  a -- I'm using the -- a phase one analysis,
25  essentially, to -- I -- the way I describe it is,

Page 21

1  if you're thinking about, like, a -- a drunk-
2  driving case, mine would be like the breathalyzer
3  and then theirs would be two different forms of
4  doing the blood analysis for alcohol.
5      Q.  Uh-huh.
6      A.  So it would be a little bit more precise.
7  Mine is essentially a screening tool to say,
8  "looks like we may have a problem" or "this
9  doesn't look like a problem."  Because the
10 testing that both of those labs do are much more
11 expensive, so we're trying to limit the amount of
12 money that they spend trying to understand the
13 problem.
14     Q.  What would be the difference between the
15 testing that you did and the testing that
16 MicroVision did as far as how in-depth it is,
17 equipment that they use?
18     A.  I'm not fully un -- cognizant of all the
19 things they do, because I haven't been in their
20 lab.
21         My understanding, at least, is that of
22 the -- they are using a -- electron microscope,
23 which allows them to see particles that are
24 smaller than visual light.  Typically the light
25 microscopy method, when particles start to get

Page 22

1  smaller than one micron, it's -- it's difficult
2  to see visually.  And those they would have a --
3  a -- a better way to optically see the smaller
4  particles.  They also are -- I believe this is
5  the one that's also doing some chemical analysis
6  on the material.  And I don't do any of the
7  chemical analysis on the material.
8      Q.  All right.  Tell me what -- kind of go
9  through this.  Mr. Irmiter, or Ryan from his
10 office -- they obtain the sample.  They provide
11 the sample to you with the -- with the chain of
12 evidence.  And then what do you do?
13     A.  I look through the chain of custody.  And
14 then I sign off initially when I receive it.  And
15 then on the dates that I do the analytical work,
16 I sign off with a -- separate dates on when
17 that's been completed.  So there's two sections
18 on the chain of custody.
19         Then I will take a look at the -- let's
20 see.  For an aerosol cassette sample I open,
21 mark -- mark it off on a -- a -- that's a -- the
22 lab notes that I have would mark it off, saying
23 on sample one and this is from wherever the --
24 the information is on the -- the chain of
25 custody.

Page 23

1          And then I'll take off the cassette.  And
2  then I'll put down the -- there's a little slide
3  that's in the aerosol cassette.
4      Q.  Uh-huh.
5      A.  And it's got a sticky section that's up.
6  I put that down on the slide.  And then I put a
7  cover slip on that.  And I use lacto-fuchsin plus
8  lactic acid.  Sometimes, if I want to make a
9  permanent mount, I use fingernail polish or I
10 will use -- that is just 85 percent lactic acid.
11 Place it down on the slide.  Take the slide, put
12 it under the scope.  Do an initial scan at 100X
13 and 200X.  And in this case I would not have had
14 the 200X in the initial scan at 100X.  And then
15 there would be a scan at 400X to take a look at
16 the particles and look for mold particles and
17 then soot-like and char-like particles.
18     Q.  Okay.  So all of this would be done from
19 you looking at a microscope?
20     A.  Yes.  That would.  For -- for the -- for
21 the aerosol cassette, yes.
22     Q.  Okay.  All right.  Now, what's the other
23 type of sample?
24     A.  The other sample there could be in this
25 case -- they had a swab sample.  And so they have

Page 24

1  a swab that they put in a -- a tube like this.
2  So I take the swab out.  And I'll take a tease
3  tape off of the surface of the swab.  And then
4  put a mounting fluid, again, either -- in this
5  case almost always either 85 percent lactic acid
6  or the lactic acid plus the lacto-fuchsin.  Put
7  it down on the slide and then optically analyze
8  the tease tape off of the swab.
9      Q.  Okay.  And that's how you came up with
10 each testing sample and what was within each
11 testing sample?
12     A.  That is correct, yes.
13     Q.  Okay.  Now, with -- with the other two
14 companies that -- or Forensic Building Science
15 was used in the phase four portion of it?
16     A.  Right.
17     Q.  There was some issue with the solution of
18 the sample.  Do you know anything about that?
19     A.  No, I don't.  That's their analytical
20 method.
21     Q.  Okay.  Did -- were you critical at all of
22 MicroVision's work?
23     A.  I don't recall -- recall that one.  I
24 would need to have my memory refreshed on that.
25     Q.  Okay.  How about with -- what is it? --

Page 25

1  EMSL?
2  A.  Yeah, I -- again, I -- that -- I --
3  not -- I'm not really in a position to judge
4  those -- those two methods, because they are
5  using techniques that I am not --
6  Q.  Okay.
7  A.  -- I'm -- I'm not privy to.
8  Q.  If EMSL, in many of their samples, came
9  back with there was no soot present and then
10 MicroVision came back that there was soot
11 present, or much -- at a higher level, would you
12 have any expert knowledge as to why those would
13 be different?
14 A.  No.  They are -- they are using techniques
15 that I don't --
16 Q.  Okay.
17 A.  -- don't use, so that wouldn't be
18 something I would know about.
19 Q.  So as far as whether MicroVision is
20 correct or EMSL is correct, you're not provided
21 to -- you're not here to provide expert opinion
22 on that?
23 A.  No, I am not.
24 Q.  Okay.  And as far as whether EMSL is using
25 some type of alcohol delusion -- dis --

Page 26

1  dilution -- is that right?  No -- diluting
2  factor, would you have any type of opinion on
3  that?
4  A.  No.
5  Q.  And you don't have an opinion as to
6  whether EM -- EMSL or MicroVision -- one would be
7  better or the other?
8  A.  I don't have enough information about
9  their technique --
10 Q.  Okay.
11 A.  -- to -- to do that.
12 Q.  And then, once you were able to examine
13 the swabs or the -- then at that point you were
14 able to provide an opinion as to what you saw?
15 A.  That's correct, yes.
16 Q.  And then that opinion -- you would have
17 provided it to Mr. Irmiter as part of the phase
18 one?
19 A.  That is correct.
20 Q.  And then at that point, unless you were
21 needed to do other testing, you would no longer
22 be involved?
23 A.  That is correct, yes.
24 Q.  Now, what -- as far as preparing for the
25 deposition, I know that you've reviewed the

Page 27

1  information that you've listed under "Basis of
2  Opinions, Data and Information Considered."
3  Did you speak with anyone in preparation
4  of your deposition, other than to tell you where
5  to go?
6  A.  I talked briefly with, I believe, this
7  gentleman.
8  THE WITNESS:  It was either you or
9  your colleague.
10 MR. SCOTT:  Clint Scott.
11 (Multiple voices.)
12 Q.  (By Ms. Carson, continuing) This is
13 Mr. Scott.
14 MR. SCOTT:  I am going to lodge an
15 objection to the extent that there are any
16 communications that are nondiscoverable.  To the
17 extent that I provided any facts or data on which
18 the witness formed his opinions, I think that
19 counsel certainly is entitled to ask that
20 question, if I did that.
21 But just general conversations I believe
22 are protected and I'd -- I would instruct the
23 witness not to disclose those.
24 Q.  (By Ms. Carson, continuing) Did -- as far
25 as your conversations with Mr. Scott or

Page 28

1  Mr. McWherter either now or -- or later,
2  understanding Mr. Scott's objection, did -- did
3  they provide you any information about what you
4  were going to be testifying to today?
5  A.  I'm trying to think.
6  Other than saying that I would be
7  testifying to -- to this.
8  Q.  Uh-huh.
9  A.  And making sure that it got to the right
10 place, I'm trying to think if there's anything
11 else that we discussed.
12 MR. SCOTT:  Note my objection is
13 any -- anything not related to facts or data upon
14 which your opinions are based in this case.
15 THE WITNESS:  Okay.
16 MR. SCOTT:  So if we discussed how to
17 get here, that has nothing to do with your facts
18 or data based on your opinions.  It -- what color
19 car you drive, that sort of thing.
20 THE WITNESS:  Okay.
21 MR. SCOTT:  And so --
22 A.  (Continuing) Yeah, I -- it was -- let's
23 see.  I -- we discussed your demeanor.  And he
24 said you were a pleasant person, which I thought
25 was --

## Page 29

1  MR. SCOTT:  Well, again, I appreciate
2  you telling the truth, but that -- that has
3  nothing to do with the facts or the data --
4  THE WITNESS:  Yeah.
5  MR. SCOTT:  -- upon which your
6  opinions -- and that's not discoverable by the
7  other side or the --
8  A.  (Continuing) Yeah, I didn't -- there --
9  there wasn't any real -- real discussion.  I'm
10  just making sure that, you know, that I -- that I
11  read through, you know -- that I read through --
12  that I was prepared and that -- if I had any
13  questions about how the process was going to go.
14  It wasn't a very long discussion.  It was
15  about -- approximately a half hour.
16  Q.  Okay.  Now, as far as your involvement in
17  this matter --
18  A.  Uh-huh.
19  Q.  -- were you contacted by Mr. Irmiter to
20  provide the analytical information or were you
21  contacted by plaintiff's counsel to become
22  involved?
23  A.  As I recall, at the beginning of the
24  process for -- for the report, I was contacted by
25  Mr. Irmiter on that.  And he -- it's a standard

## Page 30

1  practice.  I do a lot of work for him.  And he
2  just said -- he just sent some samples and said,
3  "Analyze these."
4  Q.  Now, have you ever provided testimony in
5  Tennessee?
6  A.  No.  Not to my knowledge.
7  Q.  Okay.
8  A.  I just -- just recalled another one where
9  I testified, so -- just so that you can be clear.
10  Q.  Uh-huh.
11  A.  It was on a house that was constructed.
12  And it was a mobile house.  And they had it off
13  center and it caused damage.
14  Q.  All right.
15  A.  And that was from St. Louis.  That's what
16  triggered it.  So not Tennessee, as far as I
17  know.
18  Q.  Okay.  Have you ever been admitted as an
19  expert in the state of Tennessee, that you're
20  aware of?
21  A.  Not to my knowledge, no.
22  Q.  Have you ever -- and I'm going to go
23  through a few people.  And I know that you've
24  talked to Mr. -- Mr. Irmiter.
25  A.  Yes.

## Page 31

1  Q.  Okay.  And we've kind of gone over that
2  you had some conversation with Mr. Scott, maybe
3  somebody else in his office.
4  But have you talked to anyone at Northend,
5  which is -- Northend would be the owner of the
6  building itself.  And that would be Mr. John
7  Ayers.
8  Have you ever spoken with him?
9  A.  I don't think so.  I mean, I was on a
10  conference call, but I believe it was probably --
11  I don't think his name came up.  And I apologize
12  if I don't recall it, but I don't think so.
13  Q.  Okay.  With the conference call that you
14  were on, was that just concerning the -- the case
15  itself, do you remember?  And -- and just --
16  A.  I -- well --
17  Q.  And, again --
18  A.  -- I don't know if it necessarily was the
19  case.  It was more I had the -- the results and I
20  needed to get the written document that you
21  needed.
22  Q.  Okay.
23  MR. SCOTT:  And I'm, once again,
24  going to instruct the witness, based on Federal
25  Rules of Civil Procedure 26 --

## Page 32

1  THE WITNESS:  Yeah.
2  MR. SCOTT:  -- any communications
3  that involve my office --
4  THE WITNESS:  Okay.
5  MR. SCOTT:  -- are not discoverable
6  unless there's facts or data provided during
7  those communications that help form the basis of
8  your opinion.
9  I think I'm accurately quoting.
10  MS. CARSON:  Close enough.
11  MR. SCOTT:  There may be some --
12  MS. CARSON:  Yeah.
13  THE WITNESS:  Okay.
14  Q.  (By Ms. Carson, continuing) Okay.  So --
15  so you had a conference call, you believe, at
16  some juncture.  Do you know -- and I -- again,
17  listen to what Mr. Scott said, because I believe
18  he's correct in his opinion there.
19  But who was on the conference call with
20  you?
21  A.  I remember Mr. Irmiter.  And I don't
22  recall who the other person on the line was
23  at -- at the time, but at least Mr. Irmiter was
24  on.  And we were trying to -- and there was one
25  other person.  And we were just kind of going

Page 33

1  over that I needed to get this thing --
2     Q.  Okay.
3     A.  -- put together.
4     Q.  Have you ever put together what we call
5  a -- a Rule 26 expert report before?
6     A.  Is this a Rule 26?
7     Q.  Yeah.
8     A.  Yes, I did in the Select Comfort case.
9     Q.  Okay.
10    A.  And I may have in some other ones, but
11 that's the most recent one that I recall.
12    Q.  Okay.  Do you know if you've ever talked
13 to anyone from Southern Trust, which is the
14 insurance company that I represent?
15    A.  Not to my knowledge.
16    Q.  Okay.  How about, have you ever spoken
17 with any employees that were within the building
18 in -- in Lexington?
19    A.  No.  I did not speak directly.  I -- I
20 went through the written tests -- the -- whatever
21 that was, the --
22    Q.  You read their depositions?
23    A.  The depositions, yeah.
24    Q.  Okay.
25    A.  But I don't -- I haven't talked to them in

Page 34

1  person.
2     Q.  Now, as far as the fire department.  I
3  know you have their declarations or affidavits
4  that you have read.
5        Have you ever spoken to any of them?
6     A.  No, I did not.
7     Q.  Okay.  Has anyone ever told you that
8  anyone that was working in the building, which
9  First State Bank rents it -- not First State --
10 First Bank rents it.
11       Has anyone ever told you that any employee
12 there had any type of problem with breathing,
13 headaches, any type of issue?
14    A.  I can't recall if somebody ever mentioned
15 that.
16    Q.  Okay.  You're not here today to provide
17 testimony concerning that this is a health hazard
18 for anyone, are you?
19    A.  On this one -- I have to look at this.  I
20 think -- make sure that I -- I'm going to -- not
21 serving here in a medical capacity, if that's
22 what you're saying.
23    Q.  Okay.  Well, we'll kind of get through
24 that a little bit more in --
25    A.  So it may come out that it might be

Page 35

1  different -- answer that differently as we go
2  through this.
3     Q.  Okay.  Do you work with any other
4  companies, other than FBS or Mr. Irmiter?
5     A.  Yes, I do.
6     Q.  What other companies do you work with?
7     A.  I work with Environmental Process, Inc.  I
8  work with Mac Pearce.  I work with Tamarack
9  Environmental.  I work with -- let's see.  I have
10 worked in the past with Institute For
11 Environmental Assessment.  Let's see.  Mentioned
12 Tamarack.
13       Did I mention Tamarack correctly [sic]?
14 Is that correct?
15    Q.  I think you did.
16    A.  Okay.  Yep.
17       And then I occasionally do work with
18 private homeowners that request that I come out
19 and evaluate the situation.
20       I've also worked with a company in Mankato
21 on their -- they were -- they were doing a
22 plastics operation.  And I was measuring various
23 chemicals as part of their plastics operation.
24       And I've also done work -- outside
25 consulting work on ergonomics with many different

Page 36

1  companies.  It's, I would say -- let's say
2  several different companies, to be accurate with
3  that.
4        See if there's any other ones.
5        And then occasion -- oh, then there's been
6  some small private firms, one of them which is no
7  longer -- A-1 Hartland Mold Consulting.
8     Q.  Okay.  Now, with the different companies
9  you've worked with, whether it's Mr. Irmiter or
10 some of the others that you have mentioned, I
11 think we've kind of talked about fire cases.  And
12 it appears that fire is kind of a new issue for
13 you?
14    A.  That is correct, yes.
15    Q.  Okay.
16    A.  Since that -- since the -- 2011, yep.
17    Q.  And with the fire cases that you've looked
18 at, have you ever dealt with a warehouse before?
19    A.  I may or may not have.  Because I -- I
20 don't know all the locations that -- the samples
21 that Tom sent me.
22    Q.  Okay.
23    A.  He's sent me from -- from all -- from all
24 over North America.  And so I -- I don't know if
25 some of the other ones have been warehouses.

Page 37

1  Q.  Does it matter to you whether it's an
2  indoor setting or considered to be an outdoor
3  setting, when you are looking at samples?
4  A.  Yes.
5  Q.  And what would you consider the warehouse
6  to be?
7  A.  If -- if you do a warehouse sample and the
8  building is essentially closed up 24 hours prior
9  to the sample, then it would be considered an
10  indoor setting.  If, however, all of the windows
11  and doors are open, then it would be considered
12  an outdoor sample --
13  Q.  Okay.
14  A.  -- because of the amount of outside air
15  that's coming in.
16  Q.  Do you know whether or not all the windows
17  and doors were closed in the warehouse when the
18  samples were taken?
19  A.  I read Mr. Irmiter's discussion on it.
20  And he indicated that the building was closed up,
21  but it would be based on his test -- his written
22  description.  It wouldn't be based on personal
23  knowledge that I had.
24  Q.  Okay.  Do you know anything -- well, I
25  guess, have you ever been to the building in

Page 38

1  Lexington?
2  A.  No, I have not.
3  Q.  Do you know how many large roll-up doors
4  that they have?
5  A.  No, I do not.
6  Q.  Do you know anything about the exhaust
7  system or the exhaust fans that are there?
8  A.  Not specifically, other than they -- they
9  were mentioned in one of the reports as having
10  soot on them.
11  Q.  Okay.  And as far as the history of the
12  property, do you know any information about the
13  history of the property prior to the fire?
14  A.  No direct knowledge of that.
15  Q.  Do you have any information about whether
16  or not it was used for manufacturing?
17  A.  I do not have any direct knowledge of
18  that.
19  Q.  Do you have any information concerning its
20  use with forklifts or other type of gas-powered
21  automobiles, vehicles, things like that?
22  A.  I do not have direct knowledge of that.
23  Q.  Do you know what type of heating the
24  warehouse has?
25  A.  I don't think I've been informed of that.

Page 39

1  Q.  Okay.  Now, as far as the office space
2  that was being used, did you consider that to be
3  an indoor environment?
4  A.  Yes.
5  Q.  Do you know anything about the walls that
6  separate and the ceilings that separate the
7  warehouse and the office space?
8  A.  I don't have direct knowledge of it.  I --
9  the -- they were -- from reading the description
10  of the property, there's some gypsum wall
11  assembly.  And -- and there's some insulation in
12  the walls that -- at least on the exterior
13  wall -- that it is -- it was listed in the
14  document as having a vinyl face and then having a
15  fiberglass behind the vinyl.
16  Q.  Okay.  Have you -- have you ever tested a
17  warehouse before that was in -- that did
18  manufacturing and used forklifts, to make any
19  determination whether there was any soot
20  particles?
21  A.  In that way I'd have to say I -- I am not
22  sure if I did, based on the large number of
23  samples that I received from FBS.
24  Q.  As far as you know, has anyone ever come
25  to you and asked for you to do sampling on a

Page 40

1  warehouse that did not have a fire, to make a
2  determination as to whether there was any soot
3  finding?
4  A.  I wouldn't know that for sure.
5  Q.  Okay.  Do you agree that a warehouse
6  that -- that does complete manufacturing -- that
7  would be, say, refrigeration, air systems -- they
8  would have some type of soot that would likely be
9  within the warehouse even without a fire?
10  MR. SCOTT:  Object to the form.
11  You can answer.
12  THE WITNESS:  I can answer.
13  MR. SCOTT:  Over my objection.
14  Preserve --
15  A.  (Continuing) I can.  Okay.
16  It would depend on the activities that
17  were occurring in there.
18  Q.  Okay.  Did you -- did you do any
19  investigation into this warehouse, about what
20  activities were occurring?
21  A.  I do not have any -- I did not do any
22  direct investigation.  And I don't have any
23  direct knowledge about the past activities in
24  that building.
25  Q.  If you were going to do a -- analysis of a

Page 41

1  home that used a -- used wood heating, would you
2  expect to find soot in that home?
3      A.  It would depend.  If the design of the
4  fireplace was excellent, with proper drafting, I
5  wouldn't expect to find much.  If the design of
6  the fireplace was not appropriate, that there was
7  smoke that was coming in, then yes, I would.
8      Q.  And I think we've talked about the
9  differences between soot and smoke already.
10      And with the soot, when you do an
11  analysis, that would -- the analysis would differ
12  based on the manufacturing or what was going on
13  in the building.  It would also be different
14  based on what burned.
15      MR. SCOTT:  Object to the form.
16      A.  (Continuing) I think I -- I'm not exactly
17  understanding --
18      Q.  Sure.
19      A.  -- your question.
20      Q.  If --
21      A.  If you could rephrase.
22      Q.  Uh-huh.
23      If you were going to do an analysis for
24  soot, would it -- your analysis or your findings
25  would be different depending on whether or not

Page 42

1  there was manufacturing potentially in the
2  building, whether there was gas and vehicles,
3  whether there was any type of -- of motor, maybe,
4  that was running and, if there was a fire, what
5  burned?
6      MR. SCOTT:  Object to the form.
7      A.  (Continuing) The analysis that I do -- I
8  look at the samples that come in and I -- I -- at
9  the time of the analysis I'm not given that
10  information.
11      Q.  Okay.  But with your analysis, you are
12  able to determine, like, whether it was a wood
13  fire or a plastic fire?
14      A.  My analysis is not that specific.  That's
15  why it's a phase one.
16      Q.  Okay.
17      A.  A phase-four analysis would do the
18  chemical analysis that helps you differentiate
19  that.
20      Q.  Okay.  So your analysis -- you would not
21  be able to tell the difference, whether it was a
22  gas fire or a -- any other type of fire?
23      A.  Correct.  I'm just looking at the
24  particles that are produced that appear to be
25  soot-like or char-like.

Page 43

1      Q.  And as far as EMSL or MicroVision, you're
2  not here to provide an opinion on their finding?
3      A.  That is correct, yes.
4      Q.  Does it matter how long a fire burned, in
5  your analysis?
6      A.  My analysis -- it doesn't cover that.  It
7  would -- I would just look at the particles that
8  I see.  And I don't -- I don't have knowledge of
9  that prior to doing the analysis.
10      Q.  And your testimony today is not that --
11  that because you had specific finding, that
12  certain repairs should be done?
13      A.  I think that would be inaccurate.
14      Q.  Okay.  All right.  Let me say it again.
15  Sounded like it was a bad question.
16      Based on your findings, are you stating
17  that certain repairs should be done?
18      A.  I'm -- let's see.  Let's take a look at
19  that.  Based on -- on my findings and the other
20  information provided that I reviewed, that I
21  would recommend certain -- certain things be
22  done, yes.
23      Q.  Okay.
24      A.  The -- the totality of the information.
25      Q.  Now, some of the information that we've

Page 44

1  seen -- we've seen talks about fungal growth.
2  Fungal growth has nothing to do with this case,
3  correct?
4      A.  As far as I know.
5      Q.  Okay.
6      A.  It would -- the only piece that I would
7  put in there is it -- it impacts on -- for
8  instance, we're looking -- I understand that the
9  insulation is a -- a -- a point of contention.
10  And there is actual growth on the insulation,
11  based on the samples I've had.
12      So, based on the IICRC guidelines, since
13  we have growth in the material, it will need to
14  be removed irrespective of anything else.
15      Q.  Okay.  And that's fungal growth?
16      A.  That is fungal growth.
17      Q.  But you're not giving an opinion that the
18  fungal growth was caused by the fire?
19      A.  I have no knowledge of -- of that being
20  related at all.
21      Q.  Okay.  And burning a candle in your home.
22  That can cause soot, could it not?
23      A.  Yes.
24      Q.  A charred marshmallow.  That has char on
25  the outside of the marshmallow, correct?

Page 45

1    A.   Yes.   If you -- if you cook it --
2    Q.   Long enough?
3    A.   -- and don't have it brown, yeah.
4    Q.   A campfire would potentially give off
5  soot, is that right?
6    A.   Yes.
7    Q.   Have you seen pictures of the warehouse?
8    A.   Yes, I have.   They were provided to me.
9    Q.   Are those important in your analysis?
10   A.   Yes.   They are important at least as -- at
11 my deposition here.   They weren't important with
12 respect to, you know, the -- the samples that I
13 received.   That's a separate analytical part from
14 trying to figure out what needs to be done as far
15 as remediation.
16   Q.   Okay.
17   A.   Does that help clarify?
18   Q.   I think I understand.
19        So when you get your sample, you don't go
20 and look to see to see where that sample came
21 from.   You're just looking at what's in the
22 sample?
23   A.   Right.   In fact, most of the time I just
24 go through that and then look at the location
25 later.

Page 46

1    Q.   All right.   And so why, for your
2  deposition today, is it important that you see
3  the photographs?
4    A.   I was asked to give some suggestions as to
5  what would be appropriate for remediation.   And
6  seeing the photographs, where it -- at least
7  when -- the ones that I've seen from -- I believe
8  they were taken by the fire department, where it
9  was very hazy, difficult to see.   There was what
10 appeared to be some particles of combustion on
11 cobwebs.   And then what appeared to be cuts in
12 the vinyl exterior wall insulation.   That was it.
13   Q.   Okay.   And why were those important?
14   A.   It -- it looked -- it -- from the visual
15 appearance, it looked like that as a result of a
16 recent event, i.e., the fire that occurred here,
17 that there was obvious smoke and soot deposition
18 during the course of that uncontrolled
19 combustion.
20        And that there were -- with respect to the
21 exterior vinyl wall, the whole thing was
22 completely intact and didn't have any -- any
23 gaps, it would be less likely for the soot
24 particles to enter into that insulation.   If
25 there were gaps, then it's more likely for it to

Page 47

1  be a path for the -- the -- the combustion
2  particles to be deposited.
3    Q.   Okay.   Now, you mentioned before, when I
4  asked you some questions about indoor and open --
5  indoor environment and open environment -- if
6  the -- if the warehouse had areas where there
7  were gaps in the -- between the walls and the
8  flooring where you could actually see outside,
9  would that make it a -- less likely to be an
10 indoor environment?
11   A.   It would be a less-controlled indoor
12 environment.   It would depend on, for instance,
13 the -- the way the building was pressurized or
14 not pressurized.
15   Q.   Okay.
16   A.   But it -- yeah, the more -- the more open
17 space that there is, the more similar to an
18 outdoor environment the space -- the indoor
19 environment would be.
20   Q.   Okay.   Would that change your opinion at
21 all, if you knew that there were gaps like that
22 between the walls and the flooring, where it
23 wasn't an environment where all the doors were
24 down, the windows were closed?
25   A.   Not that much.   The one sample that we had

Page 48

1  that was ambient, I said that this sample looks
2  like the -- I can't remember -- I think it was
3  the first air sample.
4    Q.   Uh-huh, right.   You can -- I don't know if
5  you have those as part of your --
6    A.   No.
7    Q.   -- report.
8    A.   Yeah.
9    Q.   This is Mr. Irmiter's report.
10   A.   Let's see if I can find that one.
11        MS. CARSON:   I'm going to take a
12 quick break, real quick, and run to the rest room
13 while he's looking at that.
14        THE WITNESS:   Okay, sure.
15        (Recess from 1:45 p.m. to 1:51 p.m.)
16        MS. CARSON:   All right.   Let's go
17 back on.
18   Q.   (By Ms. Carson, continuing) I think you
19 were going to look in your report.
20   A.   Oh, yes.
21   Q.   I'm sorry.
22   A.   I -- I dog-eared the location.   So --
23   Q.   Okay.
24   A.   So the sample number 5, which is the
25 ambient air sample in the warehouse, had

Page 49

1  organisms.  And that would -- let's see.  I --
2  there's no numbering on this page, so it's --
3      Q.  Yes.
4      A.  -- this -- this one right here, the first
5  sample.
6      Q.  Let me get --
7      A.  So -- yeah.  Let's see.  If -- if you're
8  looking, there's this thing that's kind of --
9  will come up.
10      Q.  Yeah.  I thought it would be a little
11  quicker -- okay.
12      A.  Not quite yet.
13      Q.  Okay.  I thought you were before that.
14      A.  Let's see.  There are pictures and then
15  there's the warehouse -- whole bunch of warehouse
16  pictures.
17      Q.  Uh-huh.
18      A.  So -- so we got -- you go through all 60
19  of the warehouse pictures.  And then I'm after
20  that.
21          May I help you out?
22      Q.  Yes.
23      A.  There we go.
24      Q.  Good find.  All right.
25      A.  All right.  So this the sample for air

Page 50

1  sample number five.
2      Q.  Uh-huh.
3      A.  The organisms present there -- for
4  instance, the Ganoderma, the ascospores, the
5  basidiospores, the Nigrospora, the myxomycete and
6  the pithomyces -- all of those are primarily
7  outdoor organisms.  So -- and I made a note
8  there.  This is a very -- similar to a typical
9  outdoor air sample.
10          So at least in that specific section it
11  looks like we are getting some outside air into
12  this space.  Or at least the organisms that are
13  present are ones that I would typically find in
14  an outside air sample.
15          And I apologize.  I have a daughter at
16  home.  And may I take this?
17      Q.  Please.
18      A.  Okay.  Thank you.
19          (Recess from 1:53 p.m. to 1:54 p.m.)
20          MS. CARSON:  Okay.
21      Q.  (By Ms. Carson, continuing)  Now -- and
22  I've talked a -- a little bit about this with
23  Mr. Irmiter.  But it says under notes, "very
24  similar to a typical outdoor air sample."
25      A.  Right.

Page 51

1      Q.  That is -- that's your notes.  Is that
2  your thought process from you looking at this
3  document -- or these samples or is that something
4  that this database spits out?
5      A.  No.  It's nothing that the database spits
6  out.  It's based on my experience that when I
7  see, for instance, Ganoderma, which is a organism
8  that typically grows on rotting wood -- some
9  basidiospores and ascospores.
10      Q.  All right.  Tell me what those two things
11  are.
12      A.  Oh, okay.  Basidiospores are spores that
13  are produced by mushrooms.
14      Q.  Okay.
15      A.  And Ganoderma is produced by -- if you go
16  out in the woods and you see a bracket fungi --
17  little brackets that come out.
18      Q.  Uh-huh.
19      A.  And they have a flat base here and they
20  are up like that.
21      Q.  Uh-huh, right.
22      A.  That's a Ganoderma-type organism.
23      Q.  Okay.
24      A.  And then the ascospores are produced by a
25  lot of different organisms.  Typically they are

Page 52

1  on the ground.  The most famous ascospore, which
2  is edible, is a morel mushroom.  But there's a
3  lot of other ascospores that produce those.  And
4  those are typically more outdoor fungi, unless
5  this specific structure has a tremendous amount
6  of water damage -- and I am not -- don't know if
7  that's the case in this case.
8      Q.  Okay.
9      A.  And then the myxomycete is -- are also
10  another typically found outdoor spore which
11  occasionally comes, then, inside.
12          So that profile would either indicate that
13  we had some outdoor air or that a sufficient
14  amount of outdoor air had come in, in the past,
15  to cause it to stir up to present these
16  organisms.
17      Q.  And --
18      A.  Those are -- those are fairly high for an
19  indoor sample.
20      Q.  Fairly high?
21      A.  Yes.  Especially the Ganoderma.  That's
22  atypically high.
23      Q.  Does that tell you anything?  Is that a
24  red flag to you, that it's high?
25      A.  Not necessarily a red flag.  It just

Page 53

1  indicates that the space that I'm sampling is --
2  is probably not 100 percent, but probably had
3  some out -- outside air.
4      Q.  Okay.  Now, in the second column you have
5  fung -- fungal -- fungal part -- particles, cubic
6  meter.  Those listed.  And then below that you
7  have 8,055 heavy trace.
8      That's all to do with the fungal, correct?
9      A.  Yes, that's correct, yeah.
10     Q.  Okay.  And that would be true for every
11  column, too?
12     A.  Right, right.
13     Q.  You don't have, like, a -- a specific, I
14  guess, column or information about the soot,
15  other than what's in column three, where you say,
16  for example, in number six, you have "light soot
17  most," "light char most"?
18     A.  Right.  Yeah, that's the only reference I
19  have, at least in the specific section on the
20  aerosol samples, that table, that's correct.
21     Q.  Now, what does that tell you, when you see
22  "light soot most, less than five microns"?
23     A.  The -- that would be the size of the --
24         MR. SCOTT:  Object to form.
25     Q.  (By Ms. Carson, continuing)  Oh, I'm sorry.

Page 54

1  "More than five microns"?
2      A.  Okay.  Well, it -- when it says "more than
3  five" -- "five microns," that would be -- when
4  I'm looking at the particles under a microscope,
5  I have a micrometer there.  And most of the
6  particles that would be agglomerated for the soot
7  would be in agglomerations or -- or cobbled
8  together.  Think of them like grapes.
9      Q.  Uh-huh.
10     A.  So the bunches of grapes are big enough
11  together so that they are bigger than five
12  microns.
13     Q.  Okay.  Now, when you have a -- a fire
14  like -- like this one, where it's in the
15  middle -- somewhat in the middle of a warehouse --
16     A.  Uh-huh.
17     Q.  -- would you expect to find more soot on
18  lower areas or more on higher areas?
19         MR. SCOTT:  Object to the form.
20     A.  (Continuing)  I don't have an opinion about
21  whether they would be lower or higher.  I would
22  expect more -- I would expect some to be
23  deposited on horizontal surfaces, whether they be
24  high or low.
25         And then, also, with the description that

Page 55

1  they -- read with the fire department, it
2  indicated that they had used some mechanical
3  ventilation to try to get rid of the smoke.  So
4  the force of the mechanical ventilation would
5  cause the -- the soot and the particles to be
6  deposited in a lot of different areas, as
7  evidenced by the -- like, the exhaust fans that
8  were listed in that one report or --
9      Q.  Uh-huh.
10     A.  They were deposited on that.  So you can
11  have some mechanical force that would cause it to
12  deposit it in all number of locations.
13     Q.  Okay.  How about the -- let's look at
14  number 14.
15     A.  Okay.  Yep.
16     Q.  And this is --
17         MR. SCOTT:  I'm just looking over
18  your shoulder --
19         THE WITNESS:  Well, I --
20         MR. SCOTT:  -- because I don't have a
21  copy.  So you keep it in front of you.  Don't
22  trouble -- but --
23         THE WITNESS:  Yeah, okay.
24     Q.  (By Ms. Carson, continuing)  "Well cavity
25  second floor west stair wall"?

Page 56

1      A.  Yes.
2      Q.  Oh, "30 liters," what does that mean?
3      A.  The "30 liters" is the volume of air
4  samples.
5      Q.  Okay.  And in this one it appears to be
6  more than some of the others.  And you have
7  listed "light char, heavy soot, many less than
8  five microns."
9      A.  Correct.
10     Q.  Is that right?
11     A.  That is correct, yes.
12     Q.  Okay.  And now, in this area -- do
13  you -- and I guess -- let me ask you like this.
14  Do you have any opinion as to why you're finding
15  soot in -- soot in heavier areas, then lighter in
16  some areas?
17     A.  I don't know exactly why they would be
18  deposited there.
19     Q.  Okay.
20     A.  Given that the fire department did some
21  mechanical ventilation, that could have caused
22  some -- some -- some -- some, let's say, non --
23  let's see -- some distribution that may not be
24  spread out equally.
25     Q.  Okay.

Page 57

1   A.  How about that?
2   Q.  Okay.  So when they came in and turned the
3   fans or did whatever they did, it would have
4   changed just the normal fall of the soot?
5   A.  Correct.
6   Q.  Okay.
7   A.  Because they provided mechanical energy to
8   it.
9   Q.  All right.  Okay.  I'm going to go back to
10  your opinion now.
11  A.  Sure.
12  Q.  There --
13  A.  So that's the --
14  Q.  Uh-huh.
15  A.  This one.
16  Q.  Uh-huh.
17  A.  Okay.  Thank you.
18  Q.  And, if you will, I'm just looking at the
19  summary of the opinion.
20  A.  That's on page 2.
21  Q.  2, yes, sir.
22  A.  Okay.  Sorry again.
23  Q.  No.  That's okay.
24       (Recess from 2:01 p.m. to 2:03 p.m.)
25       MS. CARSON:  Back on.

Page 58

1   A.  (Continuing) Page 2.
2   Q.  Uh-huh.
3   A.  Okay.
4   Q.  All right.  Looking at the last sentence
5   of that first paragraph, "Detection of
6   contaminants resulting from the fire event
7   indicate the need for remediation activities."
8       Okay.  Tell me what you mean by that.
9   A.  The deposit -- at least in the samples
10  that I had that were -- areas where there was
11  heavy levels of soot.  And that would be the
12  samples 14, 17.  And then we had the bulk samples
13  that were listed later.
14       They were elevated enough behind -- beyond
15  background that they require some removal.
16       And in this part, the contaminants I'm
17  also referring to, does indicate a -- a -- fungal
18  related, as well, even though it's not
19  specifically stated, because of the growth on the
20  insulation, as well.
21  Q.  Okay.  If you go down to the second
22  paragraph, it says, "The photos and their
23  testimony make it clear that fire combustion
24  byproducts were present."
25       And this is talking about the fire

Page 59

1   department.
2       What do you mean by "fire combustion
3   byproducts"?
4   A.  I mean either soot or smoke that was --
5   the photos indicate that some -- there was some
6   combustion byproduct -- deposition on the
7   cobwebs, because they were around the electrical
8   box.  And the smoke was visible because it
9   was -- there was particles that were obscuring
10  the ability to see clearly from where the
11  photograph was taken and the object they were
12  attempting to take.  So it was visually obscured.
13  Q.  Okay.  And that would be -- the smoke
14  would be obscuring their vision?
15  A.  The smoke would be obscuring their vision.
16  And then there's, you know, evidence of
17  deposition in other parts of the photo.  So we
18  have both of those concurring [sic].  And that
19  would suggest combustion by -- byproducts were
20  present.
21  Q.  And you state that "These need to be
22  cleaned or removed without regard to past history
23  of the particle deposition, if any."
24       Now, as far as what needs to be cleaned,
25  what needs to be removed, you're not providing

Page 60

1   testimony today about what specifically needs to
2   be done as far as cleaning or removing, are you?
3   A.  I was --
4       MR. SCOTT:  Object to form.
5   A.  (Continuing) I was providing, I believe,
6   later on, that -- there's some statements about
7   the porous materials that have soot on them.
8   That would be paragraph 3.
9   Q.  Okay.  The last sentence of that paragraph
10  we were just looking at.
11       "Testimony of the owner and occupants of
12  the building reveal no past contamination of the
13  loss location with combustion byproducts."
14       Now, tell me what you -- what a combustion
15  byproduct is.
16  A.  A combustion byproduct -- at least in what
17  I can see, is -- and it -- I think the --
18  probably the term would be "uncontrolled
19  combustion."  It would be -- let's say, particles
20  that are produced after some form of combustion.
21       Does that make it clear?
22  Q.  And when you mean combustion -- I mean,
23  can that be a combustion engine or is that just
24  talking about a fire?  What are you talking
25  about?

Page 61

1    A.   In this case I'm primarily talking about a
2  fire.  I'm not talking -- because I'm -- I'm
3  talking about activities that occurred on the
4  event of the fire and -- and -- and post.  I'm
5  not concerned about the activities that occurred
6  prior to that.
7    Q.   But you agree that a combustion engine can
8  cause con -- contamination?
9    A.   Of -- a -- a combustion engine
10  primarily -- in particular, let's say, a
11  diesel -- would -- does produce a particle --
12  particles as part of their combustion process.
13    Q.   And then we talked about paragraph 3
14  there, where you do talk about cleaning and about
15  replacement, but, now, you are not an expert on
16  cleaning surfaces or a restoration expert, are
17  you?
18          MR. SCOTT:  Object to the form.
19    A.   (Continuing) I'm not an expert
20  specifically -- well, let's see.  I get involved
21  with remediation.  Most of my remediation
22  expertise has been related to fungal remediation.
23         The opinion on this one is looking at the
24  samples that I received, looking at the smoke
25  intertwined with the -- with the fibers, and --

Page 62

1  and trying -- and thinking through how you would
2  extract the smoke from the intertwined fibers in
3  the fiberglass, and thinking that that would be a
4  very difficult task.
5    Q.   And this was the second fire that you had
6  provided an opinion on, is that correct?
7         Did you tell me that?
8    A.   I've got to go back.
9         That -- the other one was the one at the
10  University for my other work.
11    Q.   Okay.
12    A.   But, let's see.  And that was not for a
13  legal case.  That was for a remediation.
14    Q.   Okay.  So this was a -- your first legal
15  case involving a fire?
16    A.   Correct.  That would be the correct term.
17    Q.   Now, in the next paragraph, which is just
18  a portion of the paragraph, it says, "A proper
19  remediation of the air, as affected by soot
20  deposition, will first require the removal of the
21  contents in the building."
22         Do you know how long the contents stayed
23  in the building, without being removed?
24    A.   I -- I don't know.  And I think the
25  additional words on there are -- are a little bit

Page 63

1  of a caveat in that if they can't remove them,
2  there's other ways of doing it.
3    Q.   Okay.  And I --
4    A.   So I don't know how long they were in
5  there.
6    Q.   Do you think that it would have been
7  better, as far as the air quality, if all of the
8  items that were damaged -- if they had been
9  removed immediately from the property?
10    A.   I think that would have been prudent.
11    Q.   Okay.
12    A.   I think -- depending upon where they had a
13  place to store them.  If they were leaving them
14  outside, then no.
15    Q.   I'm looking kind of in the middle
16  of the paragraph.  It says, "All soot must be
17  removed from HVAC system, including ductwork, and
18  replacement may be only" -- "may be the only
19  viable option."
20         You don't know specifically what needs to
21  be done with the HVAC.  You would rely on a
22  qualified HVAC contractor or restoration
23  contractor for that, correct?
24          MR. SCOTT:  Object to the form.
25    A.   (Continuing) I would rely on the national

Page 64

1  association of duct cleaners guidelines.
2         The other part would be -- and I'm not
3  aware of the specific construction of -- of the
4  ductwork, whether it's specifically metal or if
5  it has an interior fiberglass lining.  If it has
6  an interior fiberglass lining, then it would --
7  the -- it would be definite removal of that.  And
8  then it's the question of whether it's more
9  cost-effective to replace the ductwork or remove
10  the interior.  And there is also safety
11  consideration with that.
12    Q.   But, again, to make that decision, you
13  would rely on the HVAC contractor or restoration
14  contractor?
15          MR. SCOTT:  Object to the form.
16    A.   (Continuing) Typically those -- when I
17  worked at it -- with respect to mold, is a joint
18  discussion between myself and the person that's
19  doing the remediation.  I'll offer suggestions.
20  And they will -- will both use their various
21  expert -- areas of expertise to -- to re -- to
22  end up with the best solution for the particular
23  circumstance.
24    Q.   But, again, for you to make that
25  determination, you would want to consult with

Page 65

1 them?

2     **A.   I would want to consult with them, yes.**

3     Q.   And as far as providing an opinion without

4 consulting with them, you would not do that

5 today?

6     **A.   Not without more information.**

7     Q.   Okay.   And I think I understand -- at

8 least in my ability -- FBS is -- and -- and your

9 two-step analysis that you do, basically

10 is -- the samples are collected.   They are sent

11 to you.   You give them really a -- a thumbs-up or

12 a thumbs-down as to whether they should proceed

13 with making a determination as to what the actual

14 soot or -- or fungal issues are, but you can say

15 yes, they are present or no, they are not

16 present.

17       And then it goes into the next phase,

18 which is where they use another contractor like

19 MicroVision to do additional samples.   And then

20 they can, with higher technology and different

21 things, be able to make a more thorough analysis?

22     **A.   That's pretty close to being correct.**

23     Q.   Okay.

24     **A.   I provide them the information.   And then**

25 **they do the interpretation of the results that I**

Page 66

1 **give them.   And then if they have questions, they**

2 **will contact me.**

3       **Does that clarify it for you?**

4     Q.   That's -- that's great.

5       And I apologize if I asked this question

6 to you before.   I may be getting confused with

7 FBS.   But has FBS ever sent you samples and you

8 did not find any soot or char or fungal --

9 whatever they were investigating -- that you did

10 not find those so that you did not go to phase

11 four?

12     **A.   Many times.**

13     Q.   In the next paragraph it begins, "All

14 three phase-four lab reports show specific areas

15 of soot contamination."

16       Now, is that also considering EMSL, too?

17     **A.   I don't know if that was or not.   I'd have**

18 **to refresh my memory on looking at EMSL's report.**

19     Q.   And then it says, "Combining the

20 eyewitness reports with the lab results, I

21 conclude that specific areas of elevated soot

22 contamination are due to the fire event of

23 February of 2015, with the eyewitness reports,

24 with the lab results."

25       Are you talking about the -- the

Page 67

1 firefighters' reports?

2     **A.   Yeah, I'm talking about the firefighters**

3 **saying that when they first arrived, it took them**

4 **a significant amount of time find the source of**

5 **the fire.   And I believe they arrived sometime,**

6 **like, at 2:00 in the morning.   And then at around**

7 **7:00 in the morning there was still smoke**

8 **present.   And then they had to work -- I can't**

9 **remember if they started at 2:00 or -- or**

10 **whatever, but then they had to mechanically**

11 **ventilate the space so that they could actually**

12 **remove the -- the -- the -- the smoke, so they**

13 **could see and investigate further as to the cause**

14 **of the damage.**

15     Q.   Okay.   I'm going to show you -- this

16 is -- this is Mr. Irmiter's second report.   And

17 this is where I understand he cut and pasted the

18 information from EMSL.

19     **A.   Uh-huh.**

20     Q.   Some of their report findings.

21     **A.   Uh-huh.**

22     Q.   And I think the question that I had asked

23 before to you was, all three phase-four report

24 labs reviewed showed specific areas of soot

25 contamination.

Page 68

1       Did the EMSL report show soot

2 contamination?

3     **A.   Yes, they did.   On sample 22.**

4     Q.   On -- as far as the other ones that he cut

5 and pasted within his report, did they show soot

6 contamination?

7     **A.   The other ones are nondetectable.**

8 **Sample 22 did.**

9     Q.   All right.   So 22 did.   And that's the

10 only one out of -- at least what he's shown

11 here -- 21 through -- what's the number down

12 there?

13     **A.   28.**

14     Q.   -- 28.   So 21 through 28 samples.   Only

15 one of those samples showed soot?

16     **A.   That is correct, yes, on that report.**

17     Q.   And then your -- the last paragraph.   You

18 have, "Removal of porous material is preferred to

19 any attempts to clean it, as cleaning of porous

20 material is not possible, the labor costs are

21 high, and the end result is not assured."

22       And have you ever tried to do any cleaning

23 of porous materials?

24     **A.   I have with respect to fungal.   And it**

25 **hasn't been -- it hasn't been -- it hasn't gone**

Page 69

1  well.  And so I -- I'm taking an analogy from the
2  work that I've done with that to -- related
3  to -- to fire material in that the particles are
4  fairly small, they get immeshed in the porous
5  material and it's difficult to take one out of
6  another and do it successfully.
7         MS. CARSON:  Oh, I got bumped to
8  tomorrow.
9         (Recess from 2:17 p.m. to 2:17 p.m.)
10  Q.  (By Ms. Carson, continuing) Okay.  I'm
11  looking at the last paragraph there.
12  A.  Sure.
13  Q.  It says -- this is on the next page.
14  Okay?
15  A.  Sure.
16  Q.  "Post remediation evaluation would be
17  recommended."
18         So after whatever the -- the work is done,
19  you would recommend going back in and doing
20  additional testing?
21  A.  Yeah.  I -- I've -- I've done this with
22  the investigation that we had at the -- the U
23  with -- particularly with respect to the smoke.
24  And I often do it after a -- a mold remediation,
25  just to make sure that people were thorough and

Page 70

1  meticulous.
2  Q.  But you've only had one other smoke,
3  correct?
4  A.  That's correct, yeah.
5  Q.  And with the fungal, where you were trying
6  to clean a porous material, with that you --
7  you've not been able to clean it, but you've
8  never tried to clean a porous material for smoke
9  or soot, correct?
10  A.  The ones that I've been involved with,
11  the -- the area that had to be cleaned, there
12  wasn't any porous materials as the building was
13  under construction.
14  Q.  That's with the fire?
15  A.  That's with the fire, yes.
16  Q.  But as far as -- you've never tried to
17  clean a porous material for smoke or soot?
18  A.  I have not.
19         And I guess I should clarify as my memory
20  comes back.  I've actually been involved with
21  two.  There was another electrical fire in
22  another building that we had to do a cleanup on,
23  as well.
24         And then that one -- I don't believe there
25  were any -- I don't recall if there were any

Page 71

1  porous materials.  I think everything was
2  removed, though.
3  Q.  Do you know whether or not you've ever had
4  your testimony challenged before?
5  A.  Yes, I have.  As -- and it was
6  unsuccessful.  It was during a mold testing --
7  Q.  Okay.
8  A.  -- they had.
9  Q.  And they were unsuccessful in trying to
10  disqualify your testimony?
11  A.  That's correct.
12  Q.  Have you ever been excluded as an expert
13  from anyone, any case?
14  A.  Not that I have been aware of.
15  Q.  Are you -- have you had an opportunity to
16  review the report of Doug Byron at FAST?  Lab
17  report?
18  A.  Yes.  That was sent to me and I reviewed
19  it.
20  Q.  Are you critical at all of Doug Byron, his
21  finding?
22  A.  I'm going to think about that a little
23  bit.
24         I'm not sure if I would agree with his --
25  his interpretation of the results.  I -- I -- I

Page 72

1  think that's probably where it would be at.
2  I -- I'm not familiar with all the specific type
3  of testing that he does.
4  Q.  And so you don't know whether or not his
5  testing is more in line to your testing or more
6  in line to MicroVision's testing?
7  A.  It would be more in line to MicroVision's
8  testing than to mine, yes.
9  Q.  And would you defer to the testing that
10  MicroVision did, the type of testing, versus your
11  testing?
12  A.  I think they are complimentary.
13  Q.  Okay.  Basically yours would be a -- kind
14  of a -- a phase one or -- or how you start, but
15  then their testing is going to be more in-depth
16  and be able to use more high-definition, that
17  type of material?
18  A.  That is correct, yes.
19         MS. CARSON:  I may be finished.  Give
20  me just two seconds.  Okay?
21         (Brief discussion held off the record.)
22         MS. CARSON:  We can go back on.
23  Q.  (By Ms. Carson, continuing) As far as your
24  finding, do you feel that the -- that based on
25  your findings, that the employees of First

## Page 73

1  State -- that -- that this information that
2  you've discovered poses a health hazard to them?
3          MR. SCOTT:  Object to the form.
4      A.  (Continuing) I -- I am not sure if I'd be
5  able to make that medical determination.
6      Q.  Okay.
7          MS. CARSON:  I think those are all
8  the questions I have for you.
9          MR. SCOTT:  I just have one or two
10 follow-ups.
11         THE WITNESS:  Sure.
12                EXAMINATION
13 BY MR. SCOTT:
14     Q.  Earlier in your testimony there were some
15 questions related to the HVAC --
16     A.  Yeah.
17     Q.  -- apparatus?
18     A.  Uh-huh.
19     Q.  And I think at the -- during that
20 conversation it had -- you had indicated that you
21 want to consult with the HVAC person --
22     A.  Yes.
23     Q.  -- to confirm or deny recommendation as to
24 what -- trying to lay the background here of my
25 next question -- confirm or deny recommendation

## Page 74

1  as to replacement?
2      A.  Correct, yes.
3      Q.  Would -- would the information that you'd
4  be asking for be re -- would it matter -- would
5  one of the things you'd be asking for -- related
6  to the insulation type of the ductwork?
7      A.  Yes.
8      Q.  All right.  And so assuming -- assuming
9  that the interior of the ductwork is -- is
10 fiberglass locked, would that be the information
11 that you would need to then offer an opinion on
12 that matter?
13     A.  Yes, that would be one of the pieces of
14 information, yes.
15     Q.  Okay.  And if it is fiberglass lined, what
16 would your recommendation be?
17     A.  I would recommend that it would be
18 removed, if it's -- interior fiberglass lined.
19 Well, if they had exterior lining, as well,
20 because you're going to have to -- it -- in my
21 opinion, based on what I'm looking at, it would
22 be incredibly difficult to -- to extract the soot
23 particles from the interwoven fiberglass
24 mechanically.  Difficult.
25         MR. SCOTT:  That's all I have.

## Page 75

1          MS. CARSON:  That's it.
2          (Deposition concluded at 2:24 p.m.)

## Page 76

1              REPORTER'S CERTIFICATE
2                STATE OF WISCONSIN
3          I hereby certify that I reported the
4  deposition of NEIL G. CARLSON, on April 7, 2017,
   in Minneapolis, Minnesota, and that the witness
5  was by me first duly sworn to tell the whole
   truth;
6
7          That the testimony was transcribed by me
   and is a true record of the testimony of the
8  witness;
9          That the cost of the original has been
   charged to the party who noticed the deposition,
10 and that all parties who ordered copies have been
   charged at the same rate for such copies;
11         That I am not a relative or employee or
   attorney or counsel of any of the parties, or
12 relative or employee of such attorney or counsel;
13         That I am not financially interested in
   the action and have no contract with the parties,
14 attorneys, or persons with an interest in the
   action that affects or has a substantial tendency
15 to affect my impartiality.
16
17         WITNESS MY HAND AND SEAL THIS 12th of
   April, 2017.
18
19
20
21
22         Nancy S. Gisch
23
24         Nancy G. Gisch, RMR, CRR, CLR
25         Notary Public, State of Wisconsin
           My commission expires on 11/13/20

Neil G. Carlson
4/7/2017

## WORD INDEX

**< 1 >**
**1:16-cv-01137**  1:7
**1:45**  48:15
**1:51**  48:15
**1:53**  50:19
**1:54**  50:19
**100**  18:21  53:2
**100X**  23:12, 14
**101**  2:16
**11**  76:25
**12:57**  1:15  2:3
**12th**  76:15
**13**  76:25
**14**  55:14  58:12
**150**  18:21
**15365**  6:20
**16340**  3:5
**16th**  19:18
**17**  4:12  58:12
**1996**  16:24  17:5

**< 2 >**
**2:00**  67:6, 9
**2:01**  57:24
**2:03**  57:24
**2:17**  69:9, 9
**2:24 p.m**  75:2
**20**  76:25
**2005**  8:14
**2007**  11:16
**200X**  23:13, 14
**2011**  18:2  36:16
**2015**  6:24  12:8  66:23
**2017**  1:14  2:2  7:22
76:4, 17
**21**  68:11, 14
**216**  19:18
**22**  6:20  68:3, 8, 9
**24**  2:3  37:8
**26**  31:25  33:5, 6
**28**  68:13, 14, 14
**29**  4:12
**29th**  7:22

**< 3 >**
**30**  56:2, 3
**38186**  3:6
**38301**  2:17

**< 4 >**
**400X**  23:15
**4th**  6:23

**< 6 >**
**60**  49:18

**66**  19:15, 24

**< 7 >**
**7:00**  67:7
**73**  4:5
**731-664-1340**  2:18

**< 8 >**
**8,055**  53:7
**85**  23:10  24:5

**< 9 >**
**901-881-9840**  3:7

**< A >**
**A-1**  36:7
**abatement**  15:4
**ability**  59:10  65:8
**able**  26:12, 14  42:12,
21  65:21  70:7  72:16
73:5
**academic**  20:4
**accent**  5:21
**accurate**  36:2
**accurately**  32:9
**acid**  23:8, 10  24:5, 6
**action**  76:13, 14
**activities**  16:19  17:7
20:7  40:16, 20, 23  58:7
61:3, 5
**actual**  44:10  65:13
**additional**  8:15  9:19
16:18  62:25  65:19
69:20
**adjacent**  13:18
**adjunct**  15:13
**admitted**  30:18
**aerosol**  22:20  23:3, 21
53:20
**affect**  76:15
**affidavits**  34:3
**affiliated**  14:16
**agglomerated**  54:6
**agglomerations**  54:7
**aggravation**  13:25
**agree**  6:16  10:13, 22
40:5  61:7  71:24
**air**  14:22  37:14  40:7
48:3, 25  49:25  50:9, 11,
14, 24  52:13, 14  53:3
56:3  62:19  63:7
**airborne**  10:19
**air-related**  13:23
**alcohol**  21:4  25:25
**alleging**  13:16
**all-inclusive**  18:8
**Allison**  11:8

**allowed**  20:3, 4, 7
**allows**  21:23
**ambient**  48:1, 25
**America**  36:24
**amount**  21:11  37:14
52:5, 14  67:4
**analogy**  69:1
**analysis**  14:14  15:17
17:8, 12  18:1  19:12
20:24  21:4  22:5, 7
40:25  41:11, 11, 23, 24
42:7, 9, 11, 14, 17, 18, 20
43:5, 6, 9  45:9  65:9, 21
**Analytical**  14:18  16:3
17:8  22:15  24:19
29:20  45:13
**analyze**  24:7  30:3
**annually**  20:7
**answer**  6:11, 13  35:1
40:11, 12
**apologize**  16:22  31:11
50:15  66:5
**apparatus**  73:17
**appear**  42:24
**appearance**  46:15
**Appearances**  2:23
**appeared**  46:10, 11
**appears**  36:12  56:5
**appreciate**  29:1
**appropriate**  41:6  46:5
**approximately**  2:3
29:15
**April**  1:14  2:2  76:4, 17
**area**  56:12  70:11
**areas**  47:6  54:18, 18
55:6  56:15, 16  58:10
64:21  66:14, 21  67:24
**arrived**  67:3, 5
**articles**  9:23, 25
**asbestos**  9:24
**ascospore**  52:1
**ascospores**  50:4  51:9,
24  52:3
**asked**  39:25  46:4  47:4
66:5  67:22
**asking**  5:24  13:7  74:4,
5
**assembly**  39:11
**Assessment**  35:11
**associated**  12:2  13:23
**association**  64:1
**assuming**  9:20  74:8, 8
**assured**  68:21
**attached**  4:16
**attempt**  14:3
**attempting**  13:18  59:12
**attempts**  68:19

**attorney**  76:11, 12
**attorneys**  76:14
**atypically**  52:22
**August**  12:8
**automobiles**  38:21
**Avenue**  2:16  19:18
**aware**  30:20  64:3
71:14
**Ayers**  31:7

**< B >**
**Back**  8:14  13:3  14:12
25:9, 10  48:17  57:9, 25
62:8  69:19  70:20
72:22
**background**  58:15
73:24
**bad**  43:15
**Bank**  34:9, 10
**base**  51:19
**based**  28:14, 18  31:24
37:21, 22  39:22  41:12,
14  43:16, 19  44:11, 12
51:6  72:24  74:21
**basically**  13:9  17:9
65:9  72:13
**basidiospores**  50:5
51:9, 12
**basis**  9:18  27:1  32:7
**bed**  12:13, 15, 21
**bedding**  12:18, 23
**beginning**  29:23
**begins**  66:13
**Behalf**  2:11  3:1  14:2
**believe**  22:4  27:6, 21
31:10  32:15, 17  46:7
60:5  67:5  70:24
**best**  64:22
**better**  22:3  26:7  63:7
**beyond**  58:14
**big**  54:10
**bigger**  54:11
**bill**  9:10
**bit**  21:6  34:24  50:22
62:25  71:23
**blank**  20:13
**Bless**  14:5
**blood**  21:4
**Bobbitt**  2:15
**Box**  3:5  59:8
**Boynton**  19:15, 23
**bracket**  51:16
**brackets**  51:17
**break**  6:6, 9, 10  48:12
**breathalyzer**  21:2
**breathing**  34:12
**Brief**  72:21

briefly 27:6
brown 45:3
build 15:14
builder 11:19
building 11:25 12:3, 7
13:18 15:14 24:14
31:6 33:17 34:8 37:8,
20, 25 40:24 41:13
42:2 47:13 60:12
62:21, 23 70:12, 22
bulk 58:12
bumped 69:7
bunch 49:15
bunches 54:10
buried 16:17
burned 41:14 42:5
43:4
burning 44:21
business 16:1 19:7, 8
byproduct 59:6 60:15,
16
byproducts 58:24 59:3,
19 60:13
Byron 71:16, 20

< C >
call 18:16 31:10, 13
32:15, 19 33:4
called 11:22 14:1
campfire 45:4
candle 44:21
capacity 34:21
car 28:19
care 9:11
CARLSON 1:13 2:1
4:2, 10 5:4, 8, 13, 16
6:18 14:18 16:3 17:9
19:4 76:4
CARSON 3:2 4:4 5:7,
8 8:25 9:3, 6 20:15, 16
27:12, 24 32:10, 12, 14
48:11, 16, 18 50:20, 21
53:25 55:24 57:25
69:7, 10 72:19, 22, 23
73:7 75:1
case 6:19 11:17 12:20
13:10, 15 14:11 17:18
19:19 21:2 23:13, 25
24:5 28:14 31:14, 19
33:8 44:2 52:7, 7 61:1
62:13, 15 71:13
cases 10:5, 6, 9 12:24
13:1, 13 14:23 17:10,
15, 19 18:5, 10, 12
36:11, 17
cassette 22:20 23:1, 3,
21

cause 44:22 52:15
55:5, 11 61:8 67:13
caused 30:13 44:18
56:21
causing 17:22
caveat 63:1
cavity 55:24
ceilings 39:6
center 30:13
certain 7:9, 11 43:12,
17, 21, 21
certainly 27:19
CERTIFICATE 76:1
Certified 2:5, 6
certify 76:2
cetera 14:7
chain 22:11, 13, 18, 24
challenged 71:4
chamber 12:13, 15, 17
change 47:20
changed 57:4
char 15:1 44:24 53:17
56:7 66:8
charged 76:9, 10
charges 9:2
char-like 23:17 42:25
charred 44:24
check 9:9
chemical 15:2 22:5, 7
42:18
chemicals 35:23
circumstance 64:23
Civil 31:25
cladosporium 12:13
claiming 12:14 13:24
clarify 18:11 45:17
66:3 70:19
class 15:15, 19
classes 15:19, 21
clean 14:25 68:19
70:6, 7, 8, 17
cleaned 59:22, 24 70:11
cleaners 64:1
cleaning 60:2 61:14,
16 68:19, 22
cleanup 14:23 15:7
70:22
clear 30:9 58:23 60:21
clearly 59:10
client 12:12
clients 11:19
Clint 27:10
CLINTON 2:12
Close 32:10 65:22
closed 37:8, 17, 20
47:24
CLR 1:24 76:24

cobbled 54:7
cobwebs 46:11 59:7
cognizant 21:18
colleague 27:9
collected 65:10
collective 7:25
college 15:14
color 28:18
column 53:4, 11, 14, 15
Combining 66:19
combustion 18:1 46:10,
19 47:1 58:23 59:2, 6,
19 60:13, 14, 16, 19, 20,
22, 23 61:7, 9, 12
come 20:1 34:25
35:18 39:24 42:8 49:9
51:17 52:14
comes 52:11 70:20
Comfort 33:8
coming 37:15 41:7
Commencing 1:15 2:2
commission 76:25
communications 27:16
32:2, 7
comp 13:12, 15 14:11
companies 24:14 35:4,
6 36:1, 2, 8
COMPANY 1:8 14:17
33:14 35:20
complete 40:6
completed 8:16, 17
22:17
completely 46:22
complimentary 72:12
components 17:14
con 15:16, 16 61:8
concern 13:23
concerned 61:5
concerning 10:9 20:12
31:14 34:17 38:19
conclude 66:21
concluded 75:2
concurring 59:18
conference 31:10, 13
32:15, 19
conferences 15:23, 23
confirm 73:23, 25
confused 66:6
consequent 12:7
consider 13:12 37:5
39:2
consideration 64:11
considered 13:6 27:2
37:2, 9, 11
considering 66:16
consist 17:9
consistent 20:20
constructed 30:11

construction 11:21
12:1 15:16 64:3 70:13
consult 64:25 65:2
73:21
consulting 16:9 17:2
20:5 35:25 36:7 65:4
consume 20:9
contact 66:2
contacted 29:19, 21, 24
contaminants 58:6, 16
contamination 60:12
61:8 66:15, 22 67:25
68:2, 6
contention 44:9
contents 62:21, 22
continued 2:23
continuing 9:6 20:16
27:12, 24 28:22 29:8
32:14 40:15 41:16
42:7 48:18 50:21
53:25 54:20 55:24
58:1 60:5 61:19 63:25
64:16 69:10 72:23
73:4
contract 76:13
contractor 63:22, 23
64:13, 14 65:18
conversation 31:2
73:20
conversations 27:21, 25
cook 45:1
copies 4:17 76:9, 10
copy 55:21
corp 17:3
correct 6:3, 21 7:22
8:11, 14 24:12 25:20,
20 26:15, 19, 23 32:18
35:14 36:14 42:23
43:3 44:3, 25 53:8, 9,
20 56:9, 11 57:5 62:6,
16, 16 63:23 65:22
68:16 70:3, 4, 9 71:11
72:18 74:2
correctly 35:13
cost 76:7
cost-effective 64:9
costs 68:20
counsel 4:17 7:10
27:19 29:21 76:11, 12
course 46:18
COURT 1:1 7:15 8:11
cover 23:7 43:6
critical 24:21 71:20
CRR 1:24 76:24
cscott@gilbertfirm.com
2:13
cubic 53:5

current 10:2
currently 14:17
Curtis 11:24
custody 22:13, 18, 25
cut 67:17 68:4
cuts 46:11
CV 8:1, 8

< D >
damage 12:6 15:1, 1, 5
30:13 52:6 67:14
damaged 63:8
Data 27:2, 17 28:13, 18
29:3 32:6
database 51:4, 5
date 6:23
dated 7:21
dates 22:15, 16
daughter 50:15
DAVIS 3:2
DAWN 3:2 5:8
dcarson@hickmanlaw.co
m 3:3
dealing 11:13 17:10, 25
dealt 36:18
decision 64:12
declarations 34:3
defects 12:1
Defendant 1:9 3:1
12:9
defer 72:9
defining 10:15, 17
definite 64:7
delusion 25:25
demeanor 28:23
deny 73:23, 25
department 15:24 34:2
46:8 55:1 56:20 59:1
depend 40:16 41:3
47:12
depending 41:25 63:12
deposit 55:12 58:9
deposited 10:20 47:2
54:23 55:6, 10 56:18
DEPOSITION 1:12 2:1
4:9 5:3, 17 7:8 8:6
9:15 11:1 12:25 13:6,
11 20:11 26:25 27:4
45:11 46:2, 17 59:6, 17,
23 62:20 75:2 76:4, 9
depositions 5:19 8:9
33:22, 23
describe 20:25
description 37:22 39:9
54:25
design 15:5, 18, 21
41:3, 5
Detection 58:5

determination 17:13
39:19 40:2 64:25
65:13 73:5
determine 42:12
diesel 61:11
differ 41:11
difference 21:14 42:21
differences 41:9
different 9:25 10:12
21:3 25:13 35:1, 25
36:2, 8 41:13, 25 51:25
55:6 65:20
differentiate 42:18
differently 35:1
difficult 22:1 46:9
62:4 69:5 74:22, 24
diluting 26:1
dilution 26:1
direct 38:14, 17, 22
39:8 40:22, 23
directly 33:19
dis 25:25
discharge 13:19
disclose 27:23
disclosed 12:5 17:24
discoverable 29:6 32:5
discovered 73:2
discussed 28:11, 16, 23
discussion 20:11, 17
29:9, 14 37:19 64:18
72:21
dispute 12:4
disqualify 71:10
distribution 56:23
DISTRICT 1:1, 2
DIVISION 1:3
document 7:11, 14
11:3 31:20 39:14 51:3
documentation 7:10, 11
documents 5:18
dog-eared 48:22
doing 14:14 15:17
17:1, 7, 8 19:11, 17
21:4 22:5 35:21 43:9
63:2 64:19 69:19
doors 37:11, 17 38:3
47:23
Doug 71:16, 20
drafting 41:4
drained 11:19
drive 28:19
driving 21:2
drunk 21:1
duct 64:1
ductwork 63:17 64:4, 9
74:6, 9
due 66:22

duly 5:5 76:5

< E >
earlier 20:11 73:14
East 2:3
EASTERN 1:3
edible 52:2
Either 9:10 16:14 24:4,
5 27:8 28:1 52:12
59:4
election 15:20
electrical 59:7 70:21
electron 21:22
elevated 58:14 66:21
EM 26:6
email 8:25 9:2
emailed 8:23 9:19
emergency 14:21
employee 34:11 76:11,
12
employees 33:17 72:25
EMSL 20:14, 15, 16, 17,
19 25:1, 8, 20, 24 26:6
43:1 66:16 67:18 68:1
EMSL's 66:18
energy 57:7
engine 60:23 61:7, 9
enter 46:24
entitled 27:19
environment 13:24
39:3 47:5, 5, 10, 12, 18,
19, 23
Environmental 35:7, 9,
11
equally 56:24
equipment 21:17
ergonomic 14:22
ergonomics 15:19, 20,
21 35:25
Especially 52:21
ESQ 2:12 3:2
Essentially 17:15
20:25 21:7 37:8
estimate 18:21, 24
et 14:7
ethylene 13:17, 19
evaluate 35:19
evaluation 69:16
event 46:16 58:6 61:4
66:22
events 15:7
evidence 22:12 59:16
evidenced 55:7
exactly 16:8 41:16
56:17
EXAMINATION 4:4, 5
5:6 73:12

examine 26:12
examined 5:5
example 53:6
excellent 41:4
exception 7:12
excluded 71:12
exhaust 15:3 38:6, 7
55:7
EXHIBIT 4:8, 11 7:8, 15,
25 8:19
EXHIBITS 4:7, 16 5:3
expect 41:2, 5 54:17,
22, 22
expensive 21:11
experience 51:6
expert 6:2 12:10 13:2,
9 25:12, 21 30:19 33:5
61:15, 16, 19 64:21
71:12
expertise 61:22 64:21
expires 76:25
exposure 13:16 15:2
extension 15:20, 24
extent 27:15, 17
exterior 39:12 46:12,
21 74:19
extract 62:2 74:22
eyewitness 66:20, 23

< F >
face 39:14
facilities 20:8
facility 14:20
fact 45:23
factor 26:2
facts 27:17 28:13, 17
29:3 32:6
fairly 52:18, 20 69:4
fall 57:4
familiar 72:2
familiarize 10:1
famous 52:1
fans 38:7 55:7 57:3
far 9:7 17:7 19:4
21:16 25:19, 24 26:24
27:24 29:16 30:16
34:2 38:11 39:1, 24
43:1 44:4 45:14 59:24
60:2 63:7 65:3 68:4
70:16 72:23
FAST 71:16
FBS 18:4, 6 35:4
39:23 65:8 66:7, 7
February 6:23 66:23
federal 7:13 31:24
fee 8:20
feel 72:24

fiberglass 39:15 62:3
  64:5, 6 74:10, 15, 18, 23
fibers 61:25 62:2
field 17:20
figure 14:24 17:21
  45:14
File 1:7 11:9
filed 7:9
filters 14:6
financially 76:13
find 16:11, 13 41:2, 5
  48:10 49:24 50:13
  54:17 66:8, 10 67:4
finding 40:3 43:2, 11
  56:14 71:21 72:24
findings 41:24 43:16,
  19 67:20 72:25
fine 9:11 19:3
fingernail 23:9
finished 72:19
fire 6:19 34:2 36:11,
  12, 17 38:13 40:1, 9
  42:4, 13, 13, 22, 22 43:4
  44:18 46:8, 16 54:13
  55:1 56:20 58:6, 23, 25
  59:2 60:24 61:2, 4
  62:5, 15 66:22 67:5
  69:3 70:14, 15, 21
firefighters 67:1, 2
fireplace 41:4, 6
fires 14:24
firms 36:6
first 10:7, 10 34:9, 9,
  10 48:3 49:4 58:5
  62:14, 20 67:3 72:25
  76:5
five 18:9 50:1 53:22
  54:1, 3, 3, 11 56:8
fix 6:4
flag 52:24, 25
flat 51:19
flood 15:8
floor 55:25
flooring 47:8, 22
fluid 24:4
follows 5:5
follow-ups 73:10
force 12:21 55:4, 11
forensic 15:17 24:14
forklifts 38:20 39:18
form 32:7 40:10 41:15
  42:6 53:24 54:19 60:4,
  20 61:18 63:24 64:15
  73:3
formed 27:18
forms 21:3
forwarded 9:4

found 52:10
four 24:15 66:11
four-page 11:2
Fourth 2:3
front 7:1 55:21
Full 5:11
fully 12:5 21:18
fung 53:5
fungal 44:1, 2, 15, 16,
  18 53:5, 5, 8 58:17
  61:22 65:14 66:8
  68:24 70:5
fungi 51:16 52:4
further 13:3 67:13

< G >
Ganoderma 50:4 51:7,
  15 52:21
Ganoderma-type 51:22
gaps 46:23, 25 47:7, 21
Gary 11:8
gas 42:2, 22
gas-powered 38:20
general 15:10 27:21
gentleman 27:7
Geoffrey 5:13
G-E-O-F-F-R-E-Y 5:15
getting 50:11 66:6
Gilbert 2:14
GISCH 1:24 2:5 76:24
give 18:20 45:4 46:4
  65:11 66:1 72:19
given 5:19 42:9 56:20
giving 44:17
go 5:16 7:6 10:15, 25
  17:20 18:24 22:8 27:5
  29:13 30:22 35:1
  45:19, 24 48:16 49:18,
  23 51:15 57:9 58:21
  62:8 66:10 72:22
goes 65:17
going 5:24 10:15 15:6
  18:11, 20 20:13 27:14
  28:4 29:13 30:22
  31:24 32:25 34:20
  40:25 41:12, 23 48:11,
  19 57:9 67:15 69:19
  71:22 72:15 74:20
good 13:4 49:24
gosh 18:7
Goza 3:4
grapes 54:8, 10
great 66:4
ground 52:1
grows 51:8
growth 11:22 12:2, 7,
  13, 14 44:1, 2, 10, 13, 15,
  16, 18 58:19

guess 15:25 37:25
  53:14 56:13 70:19
guest 15:20
guidelines 44:12 64:1
gypsum 39:10

< H >
half 29:15
HAND 76:15
Hartland 36:7
hazard 34:17 73:2
hazy 46:9
head 6:14
headaches 34:13
health 12:15 14:1
  19:15, 24 34:17 73:2
heating 38:23 41:1
heavier 10:22 56:15
heavy 53:7 56:7 58:11
held 72:21
help 32:7 45:17 49:21
helps 42:18
HEPA 14:6
Hickman 3:4
high 52:18, 20, 22, 24
  54:24 68:21
high-definition 72:16
higher 25:11 54:18, 21
  65:20
Highland 2:16
Highway 6:20
history 38:11, 13 59:22
Hold 20:13
home 15:16 19:10
  41:1, 2 44:21 50:16
homeowners 35:18
homes 15:17
horizontal 54:23
hour 9:2 29:15
hours 37:8
house 11:19 30:11, 12
huh-uh 6:15
human 15:21
HVAC 63:17, 21, 22
  64:13 73:15, 21
hygienist 14:20

< I >
i.e 46:16
IICRC 44:12
immediately 63:9
immeshed 69:4
impacts 44:7
impartiality 76:15
important 45:9, 10, 11
  46:2, 13
inaccurate 43:13

included 8:7 14:23
includes 8:3
including 63:17
incorporated 16:10, 11
  17:4
incredibly 74:22
in-depth 21:16 72:15
indicate 52:12 58:7, 17
  59:5
indicated 37:20 55:2
  73:20
indicates 53:1
indoor 13:23 14:22
  37:2, 10 39:3 47:4, 5,
  10, 11, 18 52:19
industrial 14:20
information 13:10
  22:24 26:8 27:1, 2
  28:3 29:20 38:12, 15,
  19 42:10 43:20, 24, 25
  53:14 65:6, 24 67:18
  73:1 74:3, 10, 14
informed 38:25
initial 23:12, 14
initially 22:14
inside 52:11
instance 15:8 44:8
  47:12 50:4 51:7
Institute 35:10
instruct 27:22 31:24
instructor 15:13
insulation 39:11 44:9,
  10 46:12, 24 58:20
  74:6
INSURANCE 1:8 33:14
intact 46:22
interest 76:14
interested 76:13
interior 64:5, 6, 10 74:9,
  18
interpretation 65:25
  71:25
intertwined 61:25 62:2
interwoven 74:23
investigate 67:13
investigating 66:9
investigation 17:20
  40:19, 22 69:22
investigations 14:22
INVESTORS 1:5
involve 32:3
involved 11:18 26:22
  29:22 61:20 70:10, 20
involvement 29:16
involving 6:19 62:15
Irmiter 22:9 26:17
  29:19, 25 30:24 32:21,
  23 35:4 36:9 50:23

Irmiter's  20:10  37:19
   48:9  67:16
irrespective  44:14
issue  24:17  34:13
   36:12
issues  65:14
items  63:8
its  38:19

< J >
Jackson  2:17
January  7:22
JDB-egb  1:7
job  14:14, 16
John  31:6
Johnson  11:16
joint  64:17
judge  25:3
July  11:16
juncture  32:16

< K >
keep  55:21
kind  5:16  6:3  22:8
   31:1  32:25  34:23
   36:11, 12  49:8  63:15
   72:13
knew  47:21
know  5:18  6:1, 8
   10:11  15:13  19:20
   20:21, 22  24:18  25:18
   26:25  29:10, 11  30:17,
   23  31:18  32:16  33:12
   34:3  36:20, 24  37:16,
   24  38:3, 6, 12, 23  39:5,
   24  40:4  44:4  45:12
   48:4  52:6  56:17  59:16
   62:22, 24  63:4, 20
   66:17  71:3  72:4
knowledge  25:12  30:6,
   21  33:15  37:23  38:14,
   17, 22  39:8  40:23  43:8
   44:19

< L >
lab  19:12, 13, 15, 24
   20:2  21:20  22:22
   66:14, 20, 24  71:16
labor  68:20
laboratory  17:16, 19
labs  20:12  21:10  67:24
lactic  23:8, 10  24:5, 6
lacto-fuchsin  23:7  24:6
large  11:25  15:8  38:3
   39:22
lay  73:24
layers  12:23

leaking  11:14
leaving  63:13
legal  62:13, 14
less-controlled  47:11
letter  4:12
level  25:11
levels  58:11
Lexington  6:20  33:18
   38:1
light  21:24, 24  53:16,
   17, 22  56:7
lighter  56:15
limit  21:11
line  32:22  72:5, 6, 7
lined  74:15, 18
lining  64:5, 6  74:19
listed  9:17, 18  19:9
   27:1  39:13  53:6  55:8
   56:7  58:13
listen  32:17
liters  56:3
liters,  56:2
little  21:6  23:2  34:24
   49:10  50:22  51:17
   62:25  71:22
LiveNote  2:6
LLC  1:5
located  11:20  19:5
location  19:8  45:24
   48:22  60:13
locations  36:20  55:12
locked  74:10
lodge  27:14
long  29:14  43:4  45:2
   62:22  63:4
longer  26:21  36:7
look  10:24  17:21  21:9
   22:13, 19  23:15, 16
   34:19  42:8  43:7, 18
   45:20, 24  48:19  55:13
looked  36:17  46:14, 15
looking  23:19  37:3
   42:23  44:8  45:21
   48:13  49:8  51:2  54:4
   55:17  57:18  58:4
   60:10  61:23, 24  63:15
   66:18  69:11  74:21
looks  12:8  21:8  48:1
   50:11
loss  6:23  60:13
lot  20:22  30:1  51:25
   52:3  55:6
Louis  30:15
low  54:24
lower  54:18, 21

< M >
Mac  35:8

making  28:9  29:10
   65:13
management  14:21
Mankato  35:20
manufacturing  38:16
   39:18  40:6  41:12  42:1
mark  22:21, 21, 22
MARKED  4:7  5:3  8:19
Marks  11:24  12:5
marshmallow  44:24, 25
material  12:17  22:6, 7
   44:13  68:18, 20  69:3, 5
   70:6, 8, 17  72:17
materials  9:17, 19, 21,
   22  20:8  60:7  68:23
   70:12  71:1
matter  5:9  29:17  37:1
   43:4  74:4, 12
McWherter  2:14  4:12
   28:1
mean  9:1  18:14  31:9
   56:2  58:8  59:2, 4
   60:22, 22
measuring  35:22
mechanical  55:2, 4, 11
   56:21  57:7
mechanically  67:10
   74:24
mediation  13:6  15:19
medical  34:21  73:5
memory  13:3  24:24
   66:18  70:19
Memphis  3:6
mention  35:13
mentioned  34:14  35:11
   36:10  38:9  47:3
Merit  2:5
metal  64:4
meter  53:6
method  21:25  24:20
methods  25:4
meticulous  70:1
micrometer  54:5
micron  22:1
microns  53:22  54:1, 12
   56:8
microns,  54:3
microscope  19:16
   21:22  23:19  54:4
microscopy  21:25
MicroVision  20:12, 18,
   19  21:16  25:10, 19
   26:6  43:1  65:19  72:10
MicroVision's  24:22
   72:6, 7
middle  54:15, 15  63:15
mine  21:2, 7  72:8
Minneapolis  76:4

Minnesota  2:4  13:16
   14:19  15:11, 24  19:14,
   23  76:4
mobile  30:12
modify  14:4
mold  11:14, 22  12:2, 7,
   22  15:5, 19, 22, 23
   23:16  36:7  64:17
   69:24  71:6
money  21:12
monitoring  15:2
morel  52:2
morning  67:6, 7
most,  53:17
motor  42:3
mount  23:9
mounting  24:4
move  12:22
Multiple  27:11
mushroom  52:2
mushrooms  51:13
myxomycete  50:5  52:9

< N >
N.G  14:18  16:3  17:9
   19:4
name  5:8, 10, 11  31:11
NANCY  1:24  2:4  76:24
national  63:25
nature  12:5
necessarily  31:18
   52:25
need  5:25  6:6, 7  16:5
   19:2  24:24  44:13  58:7
   59:21  74:11
needed  26:21  31:20,
   21  33:1
needs  45:14  59:24, 25
   60:1  63:20
NEIL  1:13  2:1  4:2, 10
   5:4, 13  16:2  76:4
never  70:8, 16
new  36:12
Nigrospora  50:5
non  56:22
nondetectable  68:7
nondiscoverable  27:16
normal  57:4
North  2:16  6:20  36:24
NORTHEND  1:5  31:4, 5
notary  2:7  76:24
Note  28:12  50:7
noted  12:12
notes  16:5  22:22
   50:23  51:1
Notice  4:9  7:8
noticed  76:9

Neil G. Carlson
4/7/2017

Page 6

number 39:22 48:24
50:1 53:16 55:12, 14
68:11
numbered 16:21
numbering 49:2

< O >
Object 40:10 41:15
42:6 53:24 54:19
59:11 60:4 61:18
63:24 64:15 73:3
objection 6:12 27:15
28:2, 12 40:13
objections 7:12
obscured 59:12
obscuring 59:9, 14, 15
obtain 22:10
obvious 46:17
occasion 36:5
occasionally 35:17
52:11
occupant 13:24
occupants 60:11
occurred 6:19 11:23
46:16 61:3, 5
occurring 40:17, 20
offer 64:19 74:11 ·
office 13:25 14:6
22:10 31:3 32:3 39:1,
7
Oh 8:6 11:6 16:18, 20
18:7 36:5 48:20 51:12
53:25 56:2 69:7
Okay 5:14, 23 6:18
7:1, 3, 21 8:5, 19, 23
9:3, 12, 22 10:4, 8, 11,
24 11:11, 13, 24 12:8,
24 13:15, 21 14:8 15:9,
25 16:7, 13, 16, 20, 23,
25 17:5 18:3, 17, 22
19:11, 19, 25 20:10
23:18, 22 24:9, 13, 21,
25 25:6, 16, 24 26:10
28:15, 20 29:16 30:7,
18 31:1, 13, 22 32:4, 13,
14 33:2, 9, 12, 16, 24
34:7, 16, 23 35:3, 16
36:8, 15, 22 37:13, 24
38:11 39:1, 16 40:5, 15,
18 42:11, 16, 20 43:14,
23 44:5, 15, 21 45:16
46:13 47:3, 15, 20
48:14, 23 49:11, 13
50:18, 20 51:12, 14, 23
52:8 53:4, 10 54:2, 13
55:13, 15, 23 56:5, 12,
19, 25 57:2, 6, 9, 17, 22,
23 58:3, 8, 21 59:13

60:9 62:11, 14 63:3, 11,
15 65:7, 23 67:15
69:10, 14 71:7 72:13,
20 73:6 74:15
once 26:12 31:23
ones 8:15 13:4 14:10
33:10 36:4, 25 46:7
50:13 68:4, 7 70:10
ongoing 18:7
open 22:20 37:11
47:4, 5, 16
operation 35:22, 23
opinion 9:18 25:21
26:2, 5, 14, 16 32:8, 18
43:2 44:17 47:20
54:20 56:14 57:10, 19
61:23 62:6 65:3 74:11,
21
Opinions 27:2, 18
28:14, 18 29:6
opportunity 71:15
optically 22:3 24:7
option 63:19
ordered 76:9
organism 51:7, 22
organisms 49:1 50:3, 7,
12 51:25 52:16
original 4:16, 16 76:7
outdoor 37:2, 12 47:18
50:7, 9, 24 52:4, 10, 13,
14
outside 20:5, 6 35:24
37:14 44:25 47:8
50:11, 14 53:3 63:14
owner 31:5 60:11
oxide 13:17, 19

< P >
p.m 1:15 2:3 48:15, 15
50:19, 19 57:24, 24
69:9, 9
page 2:23 4:2 10:25
11:2 16:21 49:2 57:20
58:1 69:13
paragraph 58:5, 22
60:8, 9 61:13 62:17, 18
63:16 66:13 68:17
69:11
part 8:25 15:10 17:24,
25 26:17 35:23 45:13
48:5 53:5 58:16 61:12
64:2
particle 59:23 61:11
particles 10:18, 19
21:23, 25 23:2 33:16,
16, 17 39:20 42:24
43:7 46:10, 24 47:2
53:5 54:4, 6 55:5 59:9

60:19 61:12 69:3
74:23
particular 12:20 61:10
64:22
particularly 69:23
parties 76:9, 11, 13
parts 59:17
party 76:9
pasted 67:17 68:5
path 47:1
Paul 2:4 15:22
pay 9:7 20:9
Pearce 35:8
people 12:4 30:23
69:25
percent 23:10 24:5
53:2
performed 19:21, 23
20:19
permanent 23:9
permission 19:25
person 8:22 9:20
12:21 13:17 28:24
32:22, 25 34:1 64:18
73:21
personal 37:22
persons 76:14
phase 20:24 24:15
26:17 42:15 65:17
66:10 72:14
phase-four 42:17
66:14 67:23
photo 59:17
photograph 59:11
photographs 46:3, 6
photos 58:22 59:5
physical 12:21
physically 12:22
pictures 11:20 45:7
49:14, 16, 19
piece 44:6
pieces 12:16 74:13
pithomyces 50:6
Place 23:11 28:10
63:13
places 19:14
Plaintiff 1:6 2:11
Plaintiff's 7:10 29:21
plastic 42:13
plastics 35:22, 23
PLC 2:15
pleasant 28:24
please 5:10 6:1, 3, 14
50:17
PLLC 3:4
plus 23:7 24:6
PO 3:5

point 26:13, 20 44:9
polish 23:9
pop 7:2
porous 60:7 68:18, 19,
23 69:4 70:6, 8, 12, 17
71:1
portion 24:15 62:18
poses 73:2
position 25:3
possible 68:20
possibly 20:20
post 61:4 69:16
potentially 42:1 45:4
practice 30:1
precise 21:6
preferred 68:18
premise 11:23
preparation 27:3
prepare 9:14
prepared 29:12
preparing 26:24
present 16:24 25:9, 11
50:3, 13 52:15 58:24
59:20 65:15, 16 67:8
presently 18:5
Preserve 40:14
pressurized 47:13, 14
pretty 65:22
previous 13:5 14:3
primarily 50:6 61:1, 10
prior 15:25 16:9 17:3
37:8 38:13 43:9 61:6
private 16:9 35:18
36:6
privy 25:7
probably 31:10 53:2, 2
60:18 72:1
problem 17:22 21:8, 9,
13 34:12
problems 12:6 14:1
Procedure 31:25
proceed 65:12
process 5:17 6:5
29:13, 24 35:7 51:2
61:12
produce 52:3 61:11
produced 42:24 51:13,
15, 24 60:20
professional 16:18 20:4
profile 52:12
projects 15:4 18:14, 16,
17
proper 41:4 62:18
properly 11:19 15:18
property 38:12, 13
39:10 63:9
protected 27:22

provide 13:10 22:10
25:21 26:14 28:3
29:20 34:16 43:2
65:24
provided 7:11, 14, 19
8:11, 21 10:4, 8 12:9
17:11 20:8 25:20
26:17 27:17 30:4 32:6
43:20 45:8 57:7 62:6
providing 14:13 17:16,
18 59:25 60:5 65:3
prudent 63:10
public 2:7 76:24
publications 8:3, 7
purchased 19:16
pursuant 7:12
put 23:2, 6, 6, 11 24:1,
4, 6 33:3, 4 44:7
putting 14:4

< Q >
qualified 63:22
quality 63:7
question 6:11, 13
27:20 41:19 43:15
64:8 66:5 67:22 73:25
questions 5:24 29:13
47:4 66:1 73:8, 15
quick 48:12, 12
quicker 49:11
quite 14:12 49:12
quiz 7:2
quoting 32:9

< R >
Ralph 12:10, 12
rate 76:10
read 9:16, 16, 24 29:11,
11 33:22 34:4 37:19
55:1
reading 5:18 39:9
real 29:9, 9 48:12
really 25:3 65:11
Realtime 2:6
recall 14:12 24:23, 23
29:23 31:12 32:22
33:11 34:14 70:25
recalled 30:8
receive 22:14
received 39:23 45:13
61:24
Recess 48:15 50:19
57:24 69:9
recommend 43:21
69:19 74:17
recommendation 73:23,
25 74:16

recommended 69:17
record 72:21 76:7
red 52:24, 25
Redesign 15:3
refer 7:4 16:5
reference 53:18
REFERRED 4:7
referring 58:17
refresh 66:18
refreshed 24:24
refrigeration 40:7
regard 59:22
Registered 2:5
related 28:13 44:20
58:18 61:22 69:2
73:15 74:5
relative 76:11, 12
rely 63:21, 25 64:13
remain 10:19
remed 15:19
remediate 15:6
remediation 15:7, 23
45:15 46:5 58:7 61:21,
21, 22 62:13, 19 64:19
69:16, 24
remember 11:17 16:8
31:15 32:21 48:2 67:9
remind 9:9
removal 58:15 62:20
64:7 68:18
remove 63:1 64:9
67:12
removed 44:14 59:22,
25 62:23 63:9, 17 71:2
74:18
removing 60:2
rent 20:1
rents 34:9, 10
repairs 43:12, 17
repeat 5:25
rephrase 6:1 41:21
replace 64:9
replacement 61:15
63:18 74:1
report 7:1, 16, 18, 21, 24
20:6 29:24 33:5 48:7,
9, 19 55:8 66:18 67:16,
20, 23 68:1, 5, 16 71:16,
17
REPORTED 1:24 76:2
Reporter 2:5, 6, 6 7:15
REPORTER'S 76:1
reporting 20:6
reports 38:9 66:14, 20,
23 67:1
represent 5:9 33:14
representing 14:18

request 6:10 18:4
35:18
requested 7:9
require 58:15 62:20
res 8:8
residence 8:8 12:5
19:8, 10, 18
residential 11:25
respect 45:12 46:20
64:17 68:24 69:23
response 14:21
rest 48:12
restoration 61:16
63:22 64:13
result 46:15 68:21
resulting 58:6
results 31:19 65:25
66:20, 24 71:25
resumé 8:1
retained 13:2, 9
reveal 60:12
review 71:16
reviewed 9:21 26:25
43:20 67:24 71:18
rid 55:3
right 10:24 11:5, 11
20:1 22:8 23:22 24:16
26:1 28:9 30:14 43:14
45:5, 23 46:1 48:4, 16
49:4, 24, 25 50:25
51:10, 21 53:12, 12, 18
56:10 57:9 58:4 68:9
74:8
rize 10:1
RMR 1:24 76:24
roll-up 38:3
room 48:12
rotting 51:8
rough 18:20
Rule 33:5, 6
rules 7:13 31:25
run 17:12 48:12
running 42:4
Russell 2:14
Ryan 22:9

< S >
safety 64:10
sample 22:10, 11, 20, 23
23:23, 24, 25 24:10, 11,
18 37:7, 9, 12 45:19, 20,
22 47:25 48:1, 3, 24, 25
49:5, 25 50:1, 9, 14, 24
52:19 68:3, 8
samples 17:11, 12 25:8
30:2 36:20 37:3, 18
39:23 42:8 44:11
45:12 51:3 53:20 56:4

58:9, 12, 12 61:24
65:10, 19 66:7 68:14,
15
sampling 39:25 53:1
saw 26:14
saying 22:22 28:6
34:22 67:3
says 16:24 50:23 54:2
58:22 62:18 63:16
66:19 69:13
scan 23:12, 14, 15
schedule 8:20
science 15:15 24:14
scope 23:12
SCOTT 2:12, 14 4:5
6:8 8:23 9:1, 4 20:14
27:10, 10, 13, 14, 25
28:12, 16, 21 29:1, 5
31:2, 23 32:2, 5, 11, 17
40:10, 13 41:15 42:6
53:24 54:19 55:17, 20
60:4 61:18 63:24
64:15 73:3, 9, 13 74:25
Scott's 28:2
screening 21:7
SEAL 76:15
second 53:4 55:25
58:21 62:5 67:16
seconds 72:20
Secretary 19:9
section 23:5 50:10
53:19
sections 22:17
see 11:10 17:21 18:19
21:23 22:2, 3, 20 28:23
35:9, 11 36:4 43:8, 18
45:20, 20 46:2, 9 47:8
48:10 49:1, 7, 14 51:7,
16 53:21 56:23 59:10
60:17 61:20 62:12
67:13
seeing 46:6
seen 44:1, 1 45:7 46:7
Select 33:8
selling 12:4
send 9:10
sent 9:20 30:2 36:21,
23 65:10 66:7 71:18
sentence 58:4 60:9
separate 22:16 39:6, 6
45:13
September 18:2
Service 19:15, 24
serving 34:21
setting 15:3 37:2, 3, 10
shake 6:14
shoulder 55:18

show 66:14 67:15
68:1, 5
showed 67:24 68:15
showing 12:19
shown 68:10
sic 19:10 35:13 59:18
side 29:7
sign 22:14, 16
significant 67:4
similar 47:17 50:8, 24
Simon 12:10, 12
sir 57:21
situation 10:3 17:23
35:19
six 53:16
size 53:23
slash 8:8
slide 23:2, 6, 11, 11
24:7
slip 23:7
small 36:6 69:4
smaller 21:24 22:1, 3
smoke 6:2 10:11, 18,
22 14:25 41:7, 9 46:17
55:3 59:4, 8, 13, 15
61:24 62:2 67:7, 12
69:23 70:2, 8, 17
smoke-related 10:9
solution 24:17 64:22
somebody 31:3 34:14
somewhat 54:15
soot 6:2 9:24 10:11,
19, 22 15:1 17:25 18:1
25:9, 10 38:10 39:19
40:2, 8 41:2, 9, 10, 24
44:22 45:5 46:17, 23
53:14, 16, 22 54:6, 17
55:5 56:7, 15, 15 57:4
58:11 59:4 60:7 62:19
63:16 65:14 66:8, 15,
21 67:24 68:1, 5, 15
70:9, 17 74:22
soot-like 23:17 42:25
soot-related 10:5, 6
sorry 8:6 16:12 48:21
53:25 57:22
sort 28:19
sound 6:21
Sounded 43:15
source 13:25 67:4
SOUTHERN 1:8 5:9, 21
33:13
Southwest 19:18
space 14:25 39:1, 7
47:17, 18 50:12 53:1
67:11
speak 27:3 33:19

specific 42:14 43:11
50:10 52:5 53:13, 19
64:3 66:14, 21 67:24
72:2
specifically 38:8 58:19
60:1 61:20 63:20 64:4
spend 21:12
spits 51:4, 5
spoken 31:8 33:16
34:5
spore 52:10
spores 12:22 51:12
Spragins 3:4
spread 56:24
St 2:4 15:22 30:15
stair 55:25
standard 29:25
standing 11:21
start 21:25 72:14
started 16:8 67:9
State 2:7 5:10 19:10
30:19 34:9, 9 59:21
73:1 76:2, 24
stated 58:19
statements 60:6
STATES 1:1
stating 43:16
stayed 62:22
sterilizer 13:20
Steve 11:8
sticky 23:5
stir 52:15
store 63:13
strange 6:3
Street 2:4
structural 12:6
structure 12:3 52:5
substantial 76:14
successfully 69:6
sufficient 52:13
suggest 59:19
suggestions 46:4 64:19
summary 57:19
sure 6:9 11:10 13:14
19:1 28:9 29:10 34:20
39:22 40:4 41:18
48:14 57:11 69:12, 15,
25 71:24 73:4, 11
surface 24:3
surfaces 10:20 54:23
61:16
swab 23:25 24:1, 2, 3, 8
swabs 26:13
sworn 5:5 76:5
system 15:3 38:7
63:17
systems 40:7

< T >
table 53:20
Take 4:9 6:6, 10 7:8
9:11 13:11 17:12, 21
22:19 23:1, 11, 15 24:2,
2 43:18 48:11 50:16
59:12 69:5
Taken 1:14 2:2, 3 8:10,
16 37:18 46:8 59:11
talk 6:8 13:8 61:14
talked 27:6 30:24 31:4
33:12, 25 36:11 41:8
50:22 61:13
talking 9:23 58:25
60:24, 24 61:1, 2, 3
66:25 67:2
talks 44:1
Tamarack 35:8, 12, 13
tape 24:3, 8
task 62:4
taught 15:15, 18
teach 15:12, 14
tease 24:2, 8
technique 26:9
techniques 25:5, 14
technology 65:20
Tell 11:8 22:8 27:4
42:21 51:10 52:23
53:21 58:8 60:14 62:7
76:5
telling 29:2
tendency 76:14
TENNESSEE 1:2 2:17
3:6 6:20 30:5, 16, 19
term 60:18 62:16
test 37:21
tested 39:16
testified 5:5 30:9
testify 14:1
testifying 28:4, 7
testimony 8:11 9:8
10:5, 9 11:1 12:9, 25
14:13 30:4 34:17
43:10 58:23 60:1, 11
71:4, 10 73:14 76:5, 7
testing 12:19 19:20, 22,
22 20:18, 20 21:10, 15,
15 24:10, 11 26:21
69:20 71:6 72:3, 5, 5, 6,
8, 9, 10, 11, 15
tests 33:20
Thank 7:5 9:13 20:15
50:18 57:17
theirs 21:3
thick 5:21
thing 5:20 28:19 33:1
46:21 49:8

things 21:19 38:21
43:21 51:10 65:21
74:5
think 7:10 9:22 14:9
17:24 27:18 28:5, 10
31:9, 11, 12 32:9 34:20
35:15 36:11 38:25
41:8, 16 43:13 45:18
48:2, 18 54:8 60:17
62:24 63:6, 10, 12 65:7
67:22 71:1, 22 72:1, 12
73:7, 19
thinking 10:2 21:1
62:1, 3
thorough 65:21 69:25
thought 28:24 49:10,
13 51:2
three 53:15 66:14
67:23
thumbs-down 65:12
thumbs-up 65:11
tick 12:17
time 6:5 9:8 17:4
32:23 42:9 45:23 67:4
times 10:4 66:12
today 6:18 7:7 9:7, 8,
15 19:20 28:4 34:16
43:10 46:2 60:1 65:5
Todd 11:16
toilet 11:12, 13
told 34:7, 11
Tom 20:22 36:21
tomorrow 69:8
tool 21:7
top 12:17
totality 43:24
trace 53:7
transcribed 76:5
transcript 4:17
transported 12:16
tremendous 52:5
trial 11:1 13:1
tried 68:22 70:8, 16
triggered 30:16
trouble 55:22
true 53:10 76:7
TRUST 1:8 5:9 33:13
truth 29:2 76:5
try 6:4 17:21 55:3
Trying 14:9, 24 21:11,
12 28:5, 10 32:24
45:14 62:1 70:5 71:9
73:24
tube 24:1
turned 57:2
two 19:13 21:3 22:17
24:13 25:4 51:10

70:21  72:20  73:9
**two-step**  65:9
**type**  5:20  14:14  23:23
25:25  26:2  34:12, 13
38:20, 23  40:8  42:3, 22
72:2, 10, 17  74:6
**typical**  50:8, 24
**Typically**  21:24  50:13
51:8, 25  52:4, 10  64:16

**< U >**
**uh-huh**  6:15  7:6  8:13
11:7  16:4  17:17  18:13,
18  21:5  23:4  28:8
29:18  30:10  41:22
48:4  49:17  50:2  51:18,
21  54:9, 16  55:9  57:14,
16  58:2  67:19, 21
73:18
**un**  21:18
**uncontrolled**  46:18
60:18
**understand**  5:25  7:18
10:14  21:12  44:8
45:18  65:7  67:17
**understanding**  10:21
21:21  28:2  41:17
**unfortunately**  16:17
**UNITED**  1:1
**University**  13:16  14:2,
19  15:11  19:14, 23
62:10
**unsuccessful**  71:6, 9
**use**  20:2, 7, 23  21:17
23:7, 9, 10  25:17  38:20
64:20  65:18  72:16

**< V >**
**various**  35:22  64:20
**vehicles**  38:21  42:2
**vendors**  20:23
**ventilate**  67:11
**ventilation**  55:3, 4
56:21
**versus**  72:10
**viable**  63:19
**vinyl**  39:14, 15  46:12,
21
**visible**  59:8
**vision**  59:14, 15
**visual**  21:24  46:14
**visually**  22:2  59:12
**voices**  27:11
**volume**  56:3
**vs**  1:7

**< W >**

**wall**  39:10, 13  46:12,
21  55:25
**walls**  39:5, 12  47:7, 22
**want**  9:10  10:24  11:10
23:8  64:25  65:2  73:21
**warehouse**  36:18  37:5,
7, 17  38:24  39:7, 17
40:1, 5, 9, 19  45:7  47:6
48:25  49:15, 15, 19
54:15
**warehouses**  36:25
**water**  6:7  11:21  15:4
52:6
**water-damage**  15:7
**way**  10:14, 17  20:25
22:3  39:21  47:13
**ways**  63:2
**week**  9:5
**welcome**  7:4
**Well**  10:10  13:7  29:1
31:16  34:23  37:24
54:2  55:19, 24  58:18,
20  61:20  69:1  70:23
74:19, 19
**went**  12:25  33:20
**we're**  15:6  17:10
19:19  20:4  21:11  44:8
**west**  55:25
**WESTERN**  1:2
**we've**  8:19  14:24  15:4,
22  31:1  36:11  41:8
43:25  44:1
**windows**  37:10, 16
47:24
**Wisconsin**  2:7  76:2, 24
**WITNESS**  4:2  12:10
27:8, 18, 23  28:15, 20
29:4  31:24  32:1, 4, 13
40:12  48:14  55:19, 23
73:11  76:4, 7, 15
**wood**  41:1  42:12  51:8
**woods**  51:16
**words**  62:25
**work**  14:3, 19, 22  17:16,
19  19:17  20:5  22:15
24:22  30:1  35:3, 6, 7, 8,
8, 9, 17, 24, 25  62:10
67:8  69:2, 18
**worked**  35:10, 20  36:9
64:17
**workers**  13:12, 15
14:11
**working**  18:14  34:8
**written**  31:20  33:20
37:21

**< Y >**

**yeah**  8:6  10:1  16:15
18:16  25:2  28:22  29:4,
8  32:1, 12  33:7, 23
45:3  47:16  48:8  49:7,
10  53:9, 18  55:23  67:2
69:21  70:4  73:16
**years**  18:9
**Yep**  35:16  36:16  55:15
**yes-or-no**  6:13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

NORTHEND INVESTORS, LLC,

      Plaintiff,

vs.
                            No. 1:16-cv-01137 JDB-egb
                            JURY DEMANDED

SOUTHERN TRUST INSURANCE COMPANY,

      Defendant.

## NOTICE TO TAKE DEPOSITION OF NEIL CARLSON

**PLEASE TAKE NOTICE** that the attorney for the defendant, SOUTHERN TRUST INSURANCE COMPANY, will on April 7, 2017, commencing at 1:00 P.M. at Paradigm Reporting, located at 24 East Forth Street, Walsh & Gaertner Building, St. Paul, Minnesota 55101, take the deposition of Neil Carlson whose testimony is sought regarding all matters, not privileged, which are relevant to the subject matter involved in this cause.

Deponent is requested to bring to the deposition the documents listed in *Exhibit A* which is attached hereto and incorporated herein by reference as if set out verbatim below. Please take notice that counsel will object to any documents not produced being introduced at trial.

The deposition will be taken before a registered court reporter or some other official duly authorized to administer oath. Such deposition will be taken on oral testimony and will continue from day to day until completed.



## EXHIBIT A

For each person identified as an expert witness to be called at trial, please produce the following:

1.  All documents prepared by the expert;

2.  All documents sent to each expert by you or anyone on your behalf;

3.  All documents relied upon by each expert;

4.  All documents used, consulted, or reviewed by each expert;

5.  All documents setting forth or referring to the compensation agreement between you and each expert;

6.  All documents used, relied upon, consulted, or reviewed by each expert in answering expert witness interrogatories;

7.  All documents that have been or will be shown to each expert before or during trial testimony;

8.  All documents, including a current Curriculum Vitae used to establish each expert's qualifications for trial purposes;

9.  All exhibits to be used as a summary of or support for each opinion of the expert;

10. A list of all publications the expert has authored within the past ten years;

11. A list of any other case or cases in which the expert has testified as an expert at trial or by deposition within the past five years;

12. All written reports stating the substance of the facts about which the expert is expected to testify; and

13. All written reports which state or contain the substance of the opinion(s) which the expert is expected to give.

January 29, 2017

Brandon McWherter
Gilbert Russell McWherter Scott & Bobbitt, PLC
341 Cool Springs Blvd., Ste 230
Franklin, TN 37067

      Re:    Address -     15365 Highway 22 North, Lexington, TN
               Date of Loss - February 4, 2015

      This is my expert report on the above matter. After previously providing analysis of samples taken from the loss location, I was asked to opine, from an industrial hygienist perspective, concerning the proper scope of repairs concerning the loss that occurred on February 4, 2015.

## Qualifications

      I have a Master's of Science in Environmental Health from the University of Minnesota in 1988. I have been a CIH since 1994 and President of N.G. Carlson Analytical since March of 1996. As part of that company I have been involved in over 2,500 indoor air/fungal investigation doing investigation and analysis. I developed a phase one protocol for soot analysis for FBS on September of 2011. The techniques were tested by sampling soot and char produced by burning materials in the lab. I have conducted on site investigation of a fire damaged area using these techniques and provided laboratory analysis for FBS field investigations. My further qualifications are summarized in the attached CV.

## Basis of Opinions, Data, and Information Considered

      In reaching my opinions, I relied on my education, training, experience, and background, as well as the following items which I have reviewed:

1. Forensic Building Science, Inc. report, dated October 6, 2015
2. Forensic Building Science, Inc. photo log, dated September 3, 2015
3. Forensic Building Science, Inc. repair estimate
4. Forensic Building Science, Inc. sample location sketch, dated September 3, 2015
5. N.G. Carlson Analytical, Inc. sample results, dated September 12, 2015
6. Forensic Building Science, Inc. report, dated September 16, 2016
7. Forensic Building Science, Inc. photo log, dated August 9, 2016
8. Microvision Laboratories, Inc. lab report, dated September 7, 2016 and chain of custody doc
9. EMSL Analytical, Inc. lab report, dated April 21, 2016 and chain of custody doc
10. EMSL Analytical, Inc. lab report, dated July 14, 2016 and chain of custody doc



EXHIBIT 2
WIT: Carlson
DATE: 4/7/17
Reporter: Nancy Glisch

11. Declaration of Captain David McCrury
12. Declaration of Daniel Renfroe
13. Declaration of Tim Parker
14. Forensic & Scientific Testing, Inc. report and other documentation
15. Deposition of Bob Sebastian
16. Deposition of Jerry Craig
17. Deposition of Jon Ayers
18. Deposition of Lisa McKee
19. Discussions with Tom Irmiter at Forensic Building Science, Inc.

## Summary of Opinions

Upon review of the above documents and based upon my knowledge, expertise, training, and experience, the following is my report of the necessary scope of remediation after the loss, specifically as it relates to my expertise as an industrial hygienist. I was asked to review the various materials listed above, including the lab analysis conducted by my company and other third party laboratories, and to opine regarding the presence of combustion by-products, including soot, at the subject property and the source of same. Forensic Building Science collected surface and air samples from the property that were sent to qualified laboratories, including my own, for analysis. Detection of contaminants resulting from the fire event indicate the need for remediation activities.

The photos and declarations of the fire department employees on the scene describe a building filled with dense smoke. The smoke was so thick that it made it difficult for them to locate the source of the fire. Smoke was still present the following morning. The photos and their testimony make it clear that fire combustion by-products were present and deposited on surfaces and materials during and after the fire. These need to be cleaned or removed, without regard to past history of particle deposition, if any. Based on the inner partition wall sampling by FBS and the open atmosphere construction of the building, some of this soot also deposited into wall cavities, breached blanket insulation, and behind insulation onto the metal building. Testimony of the owner and occupants of the building reveal no past contamination of the loss location with combustion by-products.

Photos of the vinyl-backed wall insulation show many breaks and cuts in the surface of the vinyl-backed insulation. Samples taken from the insulation had high levels of soot-like particles. This insulation is porous and cleaning the soot from this material is not feasible. Replacement of the affected insulation is recommended and mandatory for a proper remediation of the facility. Cleaning other porous materials with deposited soot such as carpet and fabrics is difficult, if not impossible. Replacement is the best option, and is recommended here. This should include all insulation in the warehouse including any that is trapped between the metal siding, metal roof panels, and the purlins and girts.

Proper remediation of the areas affected by soot deposition will first require the removal of the contents in the building, or if removal is not possible, hard surface contents can be cleaned

2

via wiping with a liquid detergent cleaner, dried, and then wrapping same in plastic or poly liner materials to prevent recontamination during additional remediation activities. After the contents are removed or cleaned/protected, all porous materials contaminated with soot should be removed and replaced. Porous materials such as insulation, acoustical drop ceiling tiles, or carpets should be removed and discarded according to applicable disposal regulations. Although some of those materials in the office section may have been cleaned, the presence of soot contamination in lab samples taken after cleaning indicates the materials were not cleaned appropriately or have been re-contaminated as a result of cross-contamination. All soot must be removed from HVAC system, including ductwork, and replacement may be the only viable option. A qualified HVAC contractor and/or restoration contractor should be consulted. Hard, non-porous materials may be cleaned in a manner that prevents the cleaned areas from being re-contaminated with soot using top down methods and HEPA filtered negative pressurization. Assure that the negative pressure isolation does not cause problems with back drafting of gas-fired or other combustion related devices in the building. Non porous smooth surfaces can be cleaned by wiping down the surface and discarding the wipes in accordance with applicable regulations. Dry or wet wipes with liquid detergent or approved equivalent such as microfiber cloths can be used. PPE for abatement requires skin and respiratory protection. Typical PPE includes: Tyvek suit, gloves eye protection and respiratory protection with HEPA filters. Contractor must follow OSHA PPE and respiratory protection standard.

FBS uses a two stage sampling protocol for soot/char analysis. The initial phase one analysis uses tease tapes, swabs, bulk samples and Air-o-cell cassette samples to provide a preliminary screen for the presence of soot or char and fungal organisms often present if water was used to suppress a fire. If areas with soot like particles area are identified using visual light microscopy, a phase 4 analysis is used to combining chemical analysis with higher resolution microscopy to confirm the presence of combustion by-products.

All three phase 4 lab reports reviewed show specific areas of soot contamination. Other areas in the space in the phase 1 and phase 4 analysis showed other areas with little or no contamination. Combining the eye witness reports with the lab results, I conclude that specific areas with elevated soot contamination are due to the fire event on February of 2015.

The protocol for soot and wall cavity remediation noted in Tom Irmiter's report will allow the warehouse and office space to be restored back to its pre-fire condition. Removal of porous material is preferred to any attempts to clean it as cleaning of porous material is not possible, the labor costs are high, and the end result is not assured.

Useful References:

The EPA has reviewed the health effects of fire combustion by-products.

https://www.epa.gov/burnwise/wood-smoke-and-your-health

This article outlines health effects from small soot particles and highlights the difficulty of cleaning materials contaminated with soot as part of an insurance claim.

http://www.whiteandwilliams.com/media/alert/107_Sui-Generis-08-09-12.pdf

This article offers information on the health effects of fire combustion particles and some techniques for cleaning art work that may be applicable to some items of higher value.

http://www.conservation-us.org/docs/default-source/aic-news/2010-09-Sept-AICNews.pdf


Post remediation evaluation would be recommended. After top to bottom cleaning of non-porous surfaces and removal of porous surfaces, efforts should be made to verify no contamination remains through additional wipe and vacuum surface testing. Swabs or tease tapes of suspected discolored material also can be analyzed through visual microscopy for level one screening. If suspected particles of combustion are identified they can then be analyzed for level 4 screening. If testing reveals contamination is still present, the process should be completed. After testing results confirm no additional contamination, the new porous surfaces should be installed and the space returned to its original pre-loss condition.


Respectfully submitted,

Neil G. Carlson, MS CIH

President N.G. Carlson Analytical, Inc.

4

# Neil G. Carlson

216 16th Ave SW
New Brighton, MN 55112

Phone 651-628-0498
E-mail carls001@umn.edu

Professional experience

**Public Health Specialist** [ July, 1989-Present ]
Department of Environmental Health and Safety

University of Minnesota
Minneapolis, MN

Coordinated indoor air program. Developed Standard Operating Procedure for Fungal Abatement with Facilities Management. Provided training on fungal awareness to each Facilities Management Zone, the Real Estate Office and Building Codes. Served as team lead and functional supervisor for indoor air quality program and WET Force report. Reviewed and provided feedback on memos. Provided work direction. Assisted in employee evaluation.

Developed U of MN office ergonomics program. Provided training to departments and outstate campuses on office, kitchen, laboratory and agricultural ergonomics. Conducted ergonomic evaluations in offices, labs, kitchens, custodial and agricultural settings. The program received a CSHEMA award for a unique and innovative safety program.

Co-chair and member of U of MN AFSCME/Management Committee on Office Ergonomics (1992 to Present). The committee received an Award of Merit from the Twin Cities Labor Management Council.

Assisted with certification of BSL-3 Facilities on the St. Paul Campus.

Incident commander for chemical spill response and floods.

Chaired Departmental Web Committee. Served as principle content expert for DEHS Web sites on Ergonomics and Indoor Air Quality

Assisted with plan reviews, chemical monitoring, animal allergen sampling and waste anesthetic gas monitoring.

Received access achievement award from U of MN Disability Services in October 2011.

Received Star performer Award University Services December, 2015.

**Safety Technician** [ July 1988- June, 1989 ]
Department of Environmental Health and Safety

University of Minnesota
Minneapolis, MN

Employee right to know program coordinator, monitored chemical exposures, Investigated and resolved indoor air complaints, Responded to chemical spills.

**Environmental Microbiology Lab Aid** [1987 – 1988] University of Minnesota Division of Occupational Health and Safety

**Editor-in-Chief** [1985 – 1986] Morris Weekly, U of MN Morris, campus student newspaper. Supervised ten employees. Developed budget. Served as staff photographer. Assisted with news layout, news reporting, proof reading and assigning news stories.

**News Editor** [1984 – 1985]– Morris Weekly, U of MN Morris, campus newspaper

**Teaching Assistant** [1984- 1986] General Psychology, University of Minnesota, Morris.

**Natural Science Judge** at County Fairs[1984 - 1986] Minnesota Extension Service

Education

September 1982 – June 1986                University of Minnesota, Morris                [ City, State ]

**Major: Biology  Minor: Chemistry**

- Additional coursework in Computer programming, Environmental Geology, Speech Communications, Theatre, Movies and Choreography.
- Truman Scholarship nominee

September 1986 – June 1988                University of Minnesota, Twin Cities                [ City, State ]

**Master of Science**

- Completed coursework in General Environmental Health with emphasis in Industrial Hygiene, Toxicology, Injury Prevention, Health Risk Evaluation, Scientific Writing and Environmental Health Administration.
- Interned at Community Health Service in Marshall, MN. Assisted the sanitarian. Conducted Agricultural Health and Safety injury survey. Provided occupational health monitoring in agricultural environment. Developed radon survey for the four county area.
- Completed a plan B study on lead levels in Radiator Repair shops

September 1991 – June 1994       University of Minnesota, Twin Cities
Additional Graduate coursework in Ventilation, Particles and Health, Intro to Human Factors Engineering, Indoor Air Quality, Building Science, Biochemistry, Mycology, Statistics and Medical Microbiology.

Publications
Poster Sessions
Presentations

**Publications:**

High levels of carbon monoxide are produced by electro-cautery of tissue during laparoscopic cholecystectomy, D.S. Beebe, H. Swica, **N. Carlson**, R.J. Palahniuk, R.L. Goodale (1993) *Anesth. Analg.* Vol. 77: p. 338 – 341.

Managing water infiltration in buildings, A. Quraishi, **N.G. Carlson,** (1999) *Public Risk,* May-June, p. 38-39.

Ventilation requirements in a retail store, D.T. Grimsrud, B.B Bridges, B.B., **N.G. Carlson,** D.E. Hadlich (1999) *Indoor Air 99 Proceedings, Vol. 2.* p. 332 – 337.

Floor Coverings for Basements and Below-grade Space, D. Ginther, W. Olson, **N. Carlson** (1999) U of MN Extension Service.

*Category I: Antimicrobial Pesticides – Pesticide Applicator Safety Education Manual: 2010 Indoor Mold, HVAC, and Cooling Towers*, N. Carlson, R. Fearer, D. Herzfeld, P. Huelman, K. Norlien, K. Sargent, J. Spitzmueller (2010) University of Minnesota Extension. 140p.

Application of the standard 62.1-2007 indoor air quality procedure to retail stores, B. Bridges, T. Springman, N. Carlson, S. Williams, D. Grimsrud (2013) Jan. *ASHRAE Transactions 119:265-273.*

A comprehensive plan to reduce losses from water damage at a University, NG. Carlson, K. Mullane, (2014) *Journal of Chemical Health and Safety, Vol 21: Issue 6.* p 28-33.

**Poster sessions:**

Carbon Monoxide Monitoring of Parking Lots. C. Colton, C Bates, T. Smith, **N. Carlson**, L.M. Brosseau. AIHce Salt Lake City Utah, May, 1991.

Assessment Methods for Mold Remediation. **N.G. Carlson**, D.E. Errede, J.L. Lauer, A.J. Streifel, AIHce Anaheim CA, May, 1994.

Quality Assurance Methods Used During the Remediation of Fiberglass Lined Ductwork with Fungal Contamination. **N.G. Carlson**, A.J. Streifel, AIHce Washington, DC – May, 1996.

Anatomy of a Non-viable Fungal Problem. A. Quraishi, **N.G. Carlson**, Third International Conference on Mycotoxins and Health, Saratoga Springs, NY – September, 1998.

A Method to Evaluate the Cleaning Effectiveness and Airborne Particle Generation of Vacuum Cleaners, C. Henckel, A. Quraishi – **N. Carlson**, A. Streifel, AIHce, Orlando, FL- May, 2000.

Effects of Various Control Measures on the Concentrations of Airborne Laboratory Mouse Urine Proteins – R.M. Burton, V. Ramachandran, M. Austin, **N. Carlson**, AIHce Indianapolis, IN – May 2012.

**Paper presentation(co-author):**

Anesthetic Gas Equipment Surveillance and Maintenance at a University Hospital, A.J. Streifel, E. Oberg, **N. Carlson**, AIHce, Kansas City, Missouri – May, 1995.

VAV/Manifolded Exhaust Systems Issues and Observations. M. Austin, **N. Carlson**, AIHce Washington, DC – May, 1996.

Controlling Exposure to Allergens in an Insect Rearing Laboratory -375. D. Errede, A. Streifel, N. Carlson, M. Nellis. AIHce 1998.

Refinement of Methods for Particle Analysis of Indoor Air in Health Care Facilities. A.J. Streifel, D. Errede, **N. Carlson**, AIHce 2001.

Can Fungal Infested Carpet be Saved -313. P. Ellringer, N. Carlson, AIHce 2001

Use of Infrared Imaging and Moisture Meters to Accurately Characterize Areas of Water Damage. **N. Carlson**, Podium Session PO119, 2008 AIHce in Minneapolis, MN June 3, 2008

Investigation of Appropriate Ventilation Rates for Retail Stores. David T. Grimsrud, Barry Bridges, Tony Springman. Neil Carlson, Scott Williams. Podium presentation. Indoor Air 2011 June 5-10, 2011 Austin, TX.


**Presentations:**

*Indoor Air Quality Investigations/Mold Sampling Strategies*, Big Ten Health and Safety Conference, Minneapolis, MN – September, 1992.

*Several Analytical Procedures for Evaluation of Indoor Air Problems*, Midwest Environmental Laboratory Conference, St. Paul, MN - February, 1994.

*Microbial Contamination in Indoor Environments*, Institute for Environmental Assessment, Brooklyn, Park. - February, 1994.

*Environmental Illness in Indoor Air Quality,* Minneapolis Retired Teachers Association, Minneapolis, MN - March, 1994.

*Microbial Evaluation of Remediation Techniques Used for Water Damaged Carpet and Gypsum Board,* CSHEMA, St. Lake City, UT – July, 1997.

*What do Microbial Analysis Really Tell You,* Institute for Environmental Assessment, Brooklyn, Park. - March, 1998.

*Microbial Abatement: Learning from Case Studies,* Institute for Environmental Assessment, Brooklyn, Park. - May, 1999.

*Managing Water Infiltration into Buildings,* Public Risk Managers Association, San Diego, CA - June, 1999.

*Managing Water Infiltration into Buildings,* Midwest EHS Big 10 RSO East Lansing, MI - September, 1999.

*Avoiding Indoor Microbial Problems Through Better Maintenance and Construction,* Institute for Environmental Assessment, Brooklyn, Park, MN - December, 1999.

*Carpet Management – Water Intrusion and Clean-up,* Department of Children Families and Learning, Carpet Maintenance Workshop – March, 2001.

*Flooding: Strategies for Cleaning and Drying,* U of MN Extension Service: Staff Development Conference, Minneapolis, MN – May, 2001.

*Mold and Fungal Growth in Buildings,* The Engineer's Club of Minneapolis, Minneapolis, MN - October, 2001.

*Preventing Repetitive Stress Injuries in Office Environments,* Minnesota Turf and Grounds Foundation, Minneapolis, MN – December, 2001.

*Mold! Science vs. Speculation,* Panel Discussion, F. Terracina, **N.G. Carlson,** as part of 2 day seminar: Indoor Air Quality and the Renaissance of the American Building, Institute for Environmental Assessment, Bloomington, MN – October, 2002.

*Mold in housing,* North Central Regional Conference on Mold, Lead Health Homes and Children's Environmental Health, Minneapolis, MN – October, 2002.

*Dealing with Mold Issues,* Bloomington Rental Housing Collaborative, Bloomington, MN – October, 2002

*Evaluating the Case a Reality Check,* **N.G. Carlson** and Philip Sieff, Minnesota Bar Association as part of 2 day seminar: Mold: Why Mold? Why now?, Minneapolis, MN - October, 2002.

*Investigating and Interpreting Results,* Minnesota Bar Association as part of a day long seminar: When Mold Takes Hold, Minneapolis, MN - April, 2003.

*Remediation: It Can Be a Nightmare*, Minnesota Bar Association as part of a day long seminar: When Mold Takes Hold, Minneapolis, MN - April, 2003.

*Mold Awareness for Residential Appraisers*, NAIFA regional conference, Hinkley, MN April, 2003.

*Mold investigation and Mold Ecology*, Midwest Hospital Engineers Association, St. Cloud, May, 2003.

*Mold in Buildings*, BWBR Architects, St. Paul, MN, May, 2003

*Mold a Growing Problem on Campus*, **N. Carlson**, S. Rafferty, K. Larson, National Association of College and University Attorneys 43rd Annual Conference, Minneapolis, MN - June, 2003.

*Mold and insurance issues*, Insurance Extravaganza, Prior Lake, MN – August, 2003

*Mold Remediation, Hospital Infection for Construction and Infection Control Strategies*, Midwest Hospital Engineers Association, Mahnomen, MN, September, 2003.

*Moisture and Mold – Building and Human Impact*, 9th Annual Indoor Air Quality Conference, Improving the Built Environment, Bloomington, MN - October 31, 2003.

*Mold and IAQ investigation*, Centerpoint Energy 2003 Technology Conference– November 5, 2003

*Mold Recognition and Testing*, 48th Annual Institute for Building Officials – St. Paul, MN - January, 2004.

*Mold Recognition and IAQ*, MN Building Officials Meeting, Maple Grove, MN October 20, 2004.

*Health Effects of Indoor Air Quality*, **N.G. Carlson** and William J. Angell, Minnesota Interior Design Legislative Action Committee – St. Paul, MN May 4, 2006.

*Moisture related construction defects IR photos and particle ID*, MN Indoor Air Association, Elk River, MN March 29, 2007.

*Laboratory Ergonomics* – web broadcast – National Laboratory Training Network – April 16, 2007.

*Making Foreclosure Rehabs work*, Habitat for Humanity, St. Cloud, MN – March 6, 2008.

*Ailing Homes Breed an Industry* Minnesota Bar Association, Minneapolis, MN - March, 2008.

*Use of Infrared Imaging and Moisture Meters to Accurately Characterize Areas of Water Damage,* **N.G. Carlson**, AIHce – Minneapolis, MN June 3, 2008.

*SE Minnesota Flood Response*, Minneapolis Chapter of the Indoor Air Association, St. Paul, MN June 23, 2008.

*Making Foreclosure Rehabs work*, Midwest Center for Occupational Health and Safety, Minneapolis, MN November, 2009.

*Fungal investigation, Pesticide applicator refresher course*, Chanhassen, MN November, 12, 2009.

*Indoor Allergen*, Minneapolis Chapter of the Indoor Air Association, St. Paul, MN December 1, 2009.

*Here's to Your Environmental Health: Chemical Sensitivity and the Workplace*, Jewish Family and Children's Service, Minnetonka, MN June 8, 2010.

*Water Event Task Force Results* – CSHEMA National meeting July, 2011.

*Water Event Task Force Results* – web broadcast – CSHEMA December, 2011.

*Measuring Custodial Cleaning Effectiveness*- UMS AIHA September 18, 2014.

**Additional professional activities**

President of NG. Carlson Analytical Inc. a corporation specializing in fungal identification and indoor air evaluation. (March 15, 1996 – Present)

AIHA Laboratory Safety Committee member (May 1993 – May 1995).

Developed website on School Indoor Air Quality working on a committee with American Lung Association, MN Health Department., Legislators, school district personnel and environmental consultants (1992).

Instructor at Annual Health Care and Construction Workshops – Minnesota Extension Service, Minneapolis, MN (1996 – 2001).

Instructor at Annual Recognition and Mitigation of Indoor Air Quality Issues – Midwest Center for Occupational Health and Safety, St. Paul/Minneapolis, MN - (2000 – 2002).

Instructor and program developer for at two and three day Mold Id Workshop – Midwest Center for Occupational Health and Safety (2002 – 2008).

Instructor and program developer for annual two day mold remediation workshop – Midwest Center for Occupational Health and Safety (2011 -2013)

Instructor and program developer of annual Mold and Mold Remediation Workshop – Minnesota Extension (Fall, 2002 and Fall, 2003).

Instructor and program developer for training on Office Ergonomics, Kitchen Ergonomics and Custodial Maintenance Ergonomics – Minnesota Dept. of Children Families and Learning. Provided training over 30 ergonomic workshops in Minnesota for employees of K-12 schools (1998 – 2003).

Instructor at series of four workshops on post flooding problems from the 1997 Minnesota Floods, Minnesota Extension Service, Winter, 1998.

Member of MN legislative task force with MDH and MDA on the use of antimicrobial pesticides in residences (2007)

Developed manual with the MN Dept of Ag and Health for the use of pesticides in building remediation for the Minnesota Department of Agriculture (2009 -2010)

Instructor and program developer for 1.5 day workshop on Mold identification – Midwest Center (2013)

**Continuing Education**

Hazardous Materials Level 1 (45 hours), Hennepin Technical Institute, May, 1989.

Chemical Exposures: Emergency Response and Management, Midwest Center for Occupational Health and Safety, St. Paul, MN, September, 1989.

AHERA Asbestos Abatement Project Designer, University of Wisconsin, Madison WI, March 1990.

Hazardous Materials Refresher Training, Minneapolis, MN, Spring Quarter, 1990.

Bioaerosol Monitoring Workshop – Phillip Morey, AIHce, Salt Lake City, May, 1991.

Indoor Air Quality Orientation for Public Officials, U of MN Extension, St. Paul, MN, January, 1992.

Environmental Illness – Assessment Methodology, American College of Allergy and Immunology, Chicago, IL, November, 1992.

Indoor Air Quality Symposium, AIHce Anaheim CA, May, 1994.

OSHA's Proposed Indoor Air Quality Rule, Midwest Center for Occupational Health and Safety, Minneapolis, MN - August, 1994.

Controlling Tuberculosis in the Workplace, Midwest Center for Occupational Health and Safety, Minneapolis, MN – August, 1994.

Mold in Residential Buildings, University of Minnesota Department of Design Housing and Apparel. St. Paul, MN – September, 1994.

Identification of significant species of *Aspergillus* and *Penicillium*, National Laboratory Training Network, San Antonio, Texas - August, 1995.

Cooling Towers and Legionnaire's Disease, MN Dept. of Health, Minneapolis, MN – March, 1996.

Introduction to Food and Airborne Fungi – University of Ottawa – June, 1997.

Emerging Infections Diseases, Midwest Center for Occupational Health and Safety, Minneapolis, MN September, 1997.

Current Issues Related In Indoor Air Quality, Midwest Center for Occupational Health and Safety, Minneapolis, MN September, 1997.

Health and Safety Issues related to the floods – Midwest Center for Occupational Health and Safety, Minneapolis, MN – September, 1997.

Third International Conference on Bioaerosols, Fungi and Mycotoxins, Saratoga Springs, NY – September, 1998.

Emergency Response Training – Incident Command – Minnesota Safety Council, St. Paul, MN- March, 1999.

Universal Design in the Workplace, U of MN Disability Services Minneapolis, MN – May, 1999.

On our soil – Responding to Terrorist Threats – PRIMA – San Diego, CA - June, 1999.

Combating Chemical and Biological Terrorism – Big 10 Radiation Safety Officers Conference - September, 1999.

Online Learning '99 and Performance Support '99, Lakewood Conferences, Los Angeles, CA – October, 1999.

Pitt on *Penicillium*, National Laboratory Training Network, New Orleans, LA - April, 2000.

Indoor Air Quality: Microscopy of Dust, Spores and Pollen, John Shane–McCrone Research Institute, Chicago, IL – June, 2001.

Evacuation Coordination: Train-the-Trainer - Midwest Center for Occupational Health and Safety, Minneapolis, MN – March, 2002.

Professional Development Course – AIHA-UMS 2003 Topic covered include analysis of mold samples, HVAC cleaning standards, general safety topics. St. Paul, MN– November, 2003.

Preparedness in the workplace training and research activities – U of MN, Minneapolis, MN - February 17, 2005

Mold in the Build Environment, Satellite Web Broadcast – ASHRAE – April, 2005.

2003 IBC Hazardous Materials, International Code Council, Maplewood, MN - November 16, 2005.

Emergency management courses ICS 1, 3, 5, 7, 100, 200, 700, 800A-FEMA online course – Jan – Feb, 2007.

Intermediate ICS 00300 Expanding incidents for first Responders. Minneapolis, MN – August 18-20, 2009.

IAQ/Mold 101 Webinar Benefits of Screening IAQ contaminants 1 hour webinar – Pure Air Control Services Inc. – January 12, 2010.

NORA Symposium - National Occupational Health Research Agenda – UM SPH - April 15, 2010

Control Strategies for Chemical and Biological Hazards – online training – U of MN, SPH – January 4, 2011

Best Management Practices for Animal Research Worker Safety -online training – U of MN, SPH – June 6, 2011

Maintenance Best Practices – Four hour hands on training seminar using Fluke Thermal Imaging – August 26, 2011

Ethics in the Practice of Industrial Hygiene, U of MN SPH

Minneapolis, MN – September 21, 2011.

AIHA UMS Section Annual PDC, U of MN SPH
Minneapolis, MN – November 17, 2011

Ergoexpo Educational Webinar from HP – National Ergonomics
Conference and Exposition – January 11, 2012

NORA Symposium – Inspiring a Respectful Workplace, U of M SPH
Minneapolis, MN – May 1, 2012

Fungal Data interpretation 2 hour Webinar - EmLab P&K – June 6, 2012.

AIHA UMS professional Development Conference, U of MN SPH
Minneapolis, MN – November 15, 2012.

Office of the Future: Incorporating Touch and Sit/Stand into Workstation
Design – ErgoExpo Educational Webinar – January 13, 2013

Proven Ergonomics and Safety Team Building Strategies – National
Ergonomics Conference and Exposition – February 13, 2013.

Catching Your Breath: Work Related Asthma in MN – Kathy  – AIHA-
UMS – February 21, 2013

Mold Sampling, Health Effects, and Data Interpretation 3 hour Webinar –
EmLab P&K – February 7, 2013.

Control Strategies for Physical Hazards – online training – U of MN, SPH
– April 10, 2013

Recognition and Assessment: Chemical and Biological Hazards – online
training – U of MN, SPH – April 10, 2013

Unsafe Acts/Unsafe Conditions – online training – U of MN, SPH – April
10, 2013

NORA symposium: Gun Violence Prevention with Implications for
Occupational Health – May 2, 2013

IS-00015.b   Special Events Contingency Planning for Public Safety
Agencies – June, 2013

Noise and Application of EARfit training – Dan Westrum – UMS AIHA September 19, 2013.

Campus Laboratory Hazards and Tragedies - Unique Challenges and Solutions – AIHA 2 hour Webinar. November 8, 2013.

AIHA UMS professional Development Conference, U of MN SPH Minneapolis, MN – November 21, 2013.

Fungal Aerosol Variability and Data Interpretation 1 hour Webinar – EmLab P&K – December 18, 2013.

Chemical Hazard Awareness for Public Health Workers– online training – U of MN, SPH – February 8, 2014.

| | |
|---|---|
| Professional memberships and Certifications | Industrial Hygienist in Training 1992 – 1994. |
| | Certified Industrial Hygienist 1994 to present |
| | American Industrial Hygiene Association, 1992 to present |
| | Minnesota Indoor Air Association – Board Member 2005 to 2007 |
| | Secretary Elect Local UMS AIHA chapter (2013) |
| | Secretary Local UMS AIHA chapter (2014) |
| Community Service | Adult and Sunday School teacher, Faith UMC St. Anthony MN -1990 to 2011. |
| | Volunteer, Wilshire Park Elementary St. Anthony MN - 2007 to 2013. |
| | Coach, St. Anthony Sports Boosters, St. Anthony, MN 2008 to 2010. |
| | Destination Imagination Team manager, Wilshire Park Elementary 2011 - 2012 |
| | Parade coordinator St. Anthony Villagefest 2013- 2015 |
| Web sites and blogs | DEHS departmental blog http://dehsumn.blogspot.com/ |
| | DEHS ergonomics blog http://dehsumnergo.blogspot.com/ |
| | U of MN WET force blog http://umnwetforce.blogspot.com/ |

NG Carlson Analytical Inc
http://sites.google.com/site/ngcarlsonanalyticalinc/

Sustainable Mycology
http://sustainablemycology.blogspot.com/

Ergonomics Today
http://ergonomicstoday.blogspot.com/

Books for your Mind
http://booksforyourmind.blogspot.com/

**Deposition/Trial Testimony**

2005 – Deposition – Taken in Minneapolis for South Dakota case – Plaintiff expert witness

STEVE AND ALLISON GARRY, Plaintiffs, vs. HOMELAND CENTRAL INSURANCE COMPANY formerly known as HAWKEYE SECURITY INSURANCE COMPANY, Defendant.

July, 2007: Court testimony as plaintiff expert witness

Todd P. Johnson and Sherry Ann Johnson v Brenshell Homes Inc. and Dale Wilson

October, 2010: Court testimony as plaintiff expert witness

Curtis G. Marks, et al., Respondents, v. Erotas Building Corporation, defendant and third party plaintiff

August 7, 2015 Deposition as defendant expert witness

Ralph Simon vs. Select Comfort Retail Corp. defendant.