## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

NORTHEND INVESTORS, LLC,

      Plaintiff,

v.                                                     No. 1:16-cv-01137 JDB-egb
                                                       JURY DEMANDED

SOUTHERN TRUST INSURANCE COMPANY,

      Defendant.

## MEMORANDUM IN SUPPORT OF
## MOTION TO LIMIT OR EXCLUDE TESTIMONY OF NEIL CARLSON

Pursuant to Federal Rules of Evidence 702, 703 and *Daubert*[1,] the defendant, Southern Trust

Insurance Company, by and through counsel, respectfully submits its memorandum in support of its

request for an order excluding or limiting the expert testimony of Neil Carlson.

## INTRODUCTION

This case involves a fire loss to a large building, which includes a warehouse and office

space, and a dispute between the parties as to the nature and amount of damages to the building.  The

building owner, Northend Investors, LLC ("Northend"), retained Thomas Irmiter to assess the scope

of repairs.  Irmiter's associate, Ryan Nierengarten, visited the property on September 3, 2015, and

took photographs and samples in the form of Air-O-Cell samples and swab samples.  Those samples

were then sent to Neil Carlson, who was retained by Irmiter, for "presumptive" level-one testing.

Later, additional samples were taken and sent to two other labs, MicroVision and EMSL, for level

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).

two (phase four) testing.  Carlson was not involved in any testing past level one.  As far as what the

other labs did after his involvement, Carlson testified:

>
> Q:      There was some discussion about EMSL and MicroVision and about some testing
>         that was performed, that EMSL and MicroVision and possibly your testing was not
>         consistent.  And do you know anything about that?
>
> A:      Not – not a lot.  I know that Tom [Irmiter] had been using both of those vendors.
>         They use a – I'm using the – a phase one analysis, essentially, to – I – the way I
>         describe it is, if you're thinking about, like, a  - a drunk-driving case, mine would be
>         like the breathalyzer and then theirs would be two different forms of doing the blood
>         analysis for alcohol.
>
> Q:      Uh-huh.
>
> A:      So it would be a little more precise.  Mine is essentially a screening tool to say,
>         "looks like we may have a problem" or "this doesn't look like a problem." Because
>         the testing that both of those labs do are much more expensive, so we're trying to
>         limit the amount of money that they spend trying to understand the problem.
>
> Q:      What would be the difference between the testing that you did and the testing that
>         MicroVision did as far as how in-depth it is, equipment that they use?
>
> A:      I'm not fully un – cognizant of all the things they do, because I haven't been in their
>         lab.  My understanding, at least, is that of the – they are using a – electron
>         microscope, which allows them to see particles that are smaller than visual light.
>         Typically the light microscopy method, when particles start to get smaller than one
>         micron, it's – it's difficult to see visually.  And those they would have a – a – a better
>         way to optically see the smaller particles.  They also are – I believe this is the one
>         that's also doing some chemical analysis on the material.  And I don't do any of the
>         chemical analysis on the material.
>
> Dep. NC 20:16-22:7.

Carlson was later asked if he was critical of the work of MicroVision or EMSL in this case:

>
> Q:      Okay.  Now, with – with the other two companies that – or Forensic Building Science
>         was used in the phase four portion of it?
>
> A:      Right.
>
> Q:      There was some issue with the solution of the sample.  Do you know anything about
>         that?

A:      No, I don't.  That's their analytical method.

Q:      Okay.  Did – were you critical at all of MicroVision's work?

A:      I don't recall – recall that one.  I would need to have my memory refreshed on that.

Q:      Okay.  How about with – what is it? – EMSL?

A:      Yeah, I - again, I – that – I – not – I'm not really in a position to judge those – those two methods, because they are using techniques that I am not –

Q:      Okay.

A:      - I'm not – I'm not privy to.

Q:      If EMSL, in many of their samples, came back with there was no soot present and then MicroVision came back that there was soot present, or much – at a higher level, would you have any expert knowledge as to why those would be different?

A:      No.  They are – they are using techniques that I don't –

Q:      Okay.

A:      - don't use, so that wouldn't be something I would know about.

Q:      So as far as whether MicroVision is correct or EMSL is correct, you're not provided to – you're not here to provide expert opinion on that?

A:      No, I am not.

Dep. NC 24:13-25:23.

Additionally, he testified,

Q:      Okay.  And as far as whether EMSL is using some type of alcohol delusion – dis – dilution – is that right?  No – diluting factor, would you have any type of opinion on that?

A:      No.

Q:      And you don't have an opinion as to whether EM – EMSL or MicroVision – one would be better or the other?

A:      I don't have enough information about their technique –

3

Q:      Okay.

A:      - to – to do that.

Dep. NC 25:23-26:11.

Carlson testified on the scope of his testing:

Q:      Okay.  But with your analysis, you are able to determine, like, whether it was a wood fire or a plastic fire?

A:      My analysis is not that specific.  That's why it's a phase one.

Q:      Okay.

A:      A phase-four analysis would do the chemical analysis that helps you differentiate that.

Q:      Okay.  So your analysis – you would not be able to tell the difference, whether it was a gas fire or a – any other type of fire?

A:      Correct.  I'm just looking at the particles that are produced that appear to be soot-like or char-like.

Q:      And as far as EMSL or MicroVision [who did the phase-four analysis], you're not here to provide an opinion on their finding?

A:      That is correct, yes.

Dep. NC 42:11-43:3.

Carlson was also asked if he was going to be providing testimony concerning whether a safety hazard existed:

A:      On this one -  I have to look at this.  I think – make sure that I – I'm going to – not serving here in a medical capacity, if that's what you're saying.

Dep. NC 34:16-22.

He later testified (over objection) that he is not sure if he'd be able to make that medical determination.  Dep. NC 72:23-73:5.

Fire cases are a new issue for Carlson.  Dep. NC 36:8-16.  He is not aware of any of the other fire cases he's dealt with involved warehouses.  Dep. NC 36:17-21.  This is only Carlson's third fire case and his first legal case involving a fire.  Dep. NC 62:5-16.  Carlson has never visited the property and has no personal knowledge of its history.  Dep. NC 37:24-38:25.  And Carlson does not have an opinion on why he found difficult levels of soot in different areas.  Dep. NC 56:12-18.

As to his proposed opinion on remediation (cleaning or replacement), Carlson testified (over objection),

Q:     And then we talked about paragraph 3 [Carlson Report] there, where you do talk about cleaning and about replacement, but, now, you are not an expert on cleaning surfaces or a restoration expert, are you?

A:     I'm not an expert specifically – well, let's see.  I get involved with remediation. Most of my remediation expertise has been related to fungal remediation.

The opinion on this one is looking at the samples I received, looking at the smoke intertwined with the – with the fibers, and – and trying – and thinking through how you would extract the smoke from the intertwined fibers in the fiberglass, and thinking that would be a very difficult task.

Dep. NC 61:13-62:4.

Carlson's Report also states an opinion on potential replacement of the HVAC system, though he testified during his deposition that he would "rely on the national association of duct cleaner guidelines[]" and was "not aware of the specific construction of – of the ductwork[.]"  Dep. NC 63:15-64:11.  For his opinion on this issue, he "would want to consult" with the person that's doing the remediation and would not provide an opinion on that issue "without more information."  Dep. NC 64:16-65:6.

Carlson's Report further opined: "Removal of porous material is preferred to any attempts to clean it, as cleaning of porous material is not possible, the labor costs are high, and the end result is not assumed[,]" but Carlson has never tried cleaning porous material with respect to fire, smoke or

soot.  Dep. NC 68:17-69:6, 70:5-18.  His opinion is based only on an analogy between fungal

material and fire material.  Dep. NC 68:24-69:6.

As far as his opinions on the report of Doug Byron of FAST, Carlson was not sure if he

would agree with Bryon's interpretations, stating that he was not familiar with the specific type of

testing that Bryon does.  Dep. NC 71:15-72:3.

## LAW AND ARGUMENTS

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts
> of the case.

*Id.*

In *Daubert*, the Supreme Court held that Rule 702 "clearly contemplates some degree of

regulation of the subjects and theories about which an expert may testify."  509 U.S. at 589.  *Daubert*

places a "gatekeeping" function on courts to ensure that expert testimony "is not only relevant, but

also reliable."  *Id.*  The reviewing court is to determine whether the "reasoning and methodology

underlying the [expert's] testimony is scientifically valid and whether that reasoning or methodology

properly can be applied to the facts in issue."  *Id.* at 592-93.  A trial court must determine whether

the proffered expert is qualified to render the opinions he or she proposes to give and also determine

whether the methodology underlying the expected testimony is valid and whether it can be properly

applied to the facts at issue in a particular case. *Id.* The Supreme Court has identified several factors to assist courts in the reliability assessment including: (1) whether the theory or technique can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory or technique is generally accepted by the scientific community. *Id.* at 593-94.

In analyzing the relevancy and reliability of a proposed expert's testimony, this Court has stated:

> *Daubert* requires a two-step inquiry that analyzes the "relevance and reliability" of an expert's opinion. During the relevance step, the court is to ensure that "there is a 'fit' between the testimony and the issue to be resolved by the trial." During the reliability step, the court focuses on the "methodology and principles" that form the basis for the expert's testimony. The court is to examine the reliability of the methodology and principles underlying the testimony, not on the reliability of the conclusions reached by the expert because "if the principles, methodology and reasoning are scientifically valid then it follows that the inferences, assertions, and conclusions derived therefrom are scientifically valid as well."

> *Bohannon v. Baptist Memorial Hosp.-Tipton*, No. 08–2220–STA, 2010 WL 1957269, at *2 (W.D. Tenn. May 13, 2010) (citing *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir.1999)).

## I.     Qualifications

Carlson does not have the requisite knowledge to offer opinions on the analytical work or testing done by MicroVision or EMSL, and his opinions at trial should be limited to only his work on this case – the presumptive level one testing. He testified that those labs are using techniques that he doesn't use and he doesn't have enough information on and that he is not providing an expert opinion on the testing of MicroVision or EMSL. Dep. NC 24:13-25:23.

Moreover, Carlson's report and testimony demonstrates that he does not have the required specialized knowledge to offer opinions on remediation or cleaning of soot in warehouse settings as the result of a fire. Dep. NC 70:16-18.     Additionally, because Carlson testified that he was not

familiar with the testing used by Doug Bryon at FAST and stated that he was not sure if he would agree with Bryon's report or opinions in this case, he lacks the specialized knowledge required to offer opinions on Bryon's work on this case.  Dep. NC 71:15-72:3.

## II.     Relevancy

Similarly, any proposed expert testimony of Carlson on the analytical or lab work done by MicroVision or EMSL would not be relevant to the issues in this case because he concedes he does not have enough information on the techniques they used in their testing and testified that he was not offering opinions on MicroVision or EMSL.  Dep. NC 42:11-43:3.  Moreover, Carlson's proposed expert opinions on remediation are not relevant because there is no "fit" between his testimony and the issues to be decided at trial.  This is Carlson's first fire case to go to litigation and his first to be designated as an expert; his opinion on remediation is based on an analogy between fungal matter and soot particles and he has never attempted to do what he claims can't be done here.  Dep. 68:17-70:18.  Neither Carlson's report nor testimony provides the link between assimilating these two particulates and whether cleaning or restoration methods in buildings are identical between the two.  His report states that he is opining on the "necessary scope of remediation after the loss, specifically as it relates to [his] experience as an industrial hygienist."  CARLSON REPORT at 2.  As to his proposed opinion on remediation (cleaning or replacement), Carlson testified (over objection),

> Q:     And then we talked about paragraph 3 [Carlson Report] there, where you do talk about cleaning and about replacement, but, now, you are not an expert on cleaning surfaces or a restoration expert, are you?
>
> A:     I'm not an expert specifically – well, let's see.  I get involved with remediation.  Most of my remediation expertise has been related to fungal remediation.
>
> The opinion on this one is looking at the samples I received, looking at the smoke intertwined with the – with the fibers, and – and trying – and thinking through how you would extract the smoke from the intertwined fibers in the fiberglass, and thinking that would be a very difficult task.

Dep. NC 61:13-62:4.

But his testimony provides no link between his supposition that a finding of soot contamination at various places in a 60,000 square foot warehouse and his proposed scope of repairs. Because Carlson offered no specific testimony that soot is unable to be cleaned from "porous material," his testimony on remediation does not fit with the issues in this case. And for his opinion on potential replacement of the HVAC system (and components), he would want to consult with the person doing the remediation work and would not offer an opinion without more information. Dep. NC 64:16-65:6. Carlson's report and testimony further fails to establish how his detection of char-like or soot-like particles in samples provided to his lab necessitate replacement of all insulation and other porous material in the building and its HVAC system and components.

### III.   Reliability

Further, Carlson's opinions on the analytical work outside his level one testing and on his proposed scope of remediation are unreliable. Carlson testified that he is unfamiliar with the techniques used by MicroVision or EMSL in this case and would not be offering an opinion on their procedures or findings. Dep. NC 24:13-25:23, 42:11-43:3. And Carlson's opinion on remediation is unreliable because he has never tried cleaning porous material following a fire; because he needs more information to render an opinion on the necessity of replacing the HVAC system; and because he states that he is not offering an opinion on whether the presence of soot in the building presents a safety hazard to the occupants. Thus, Carlson's opinions lack foundation and there is no theory or technique that can or has been tested, including whether it was subject to peer review or publication or generally accepted by the scientific community. Carlson's proposed expert testimony further fails to establish how his detection of char-like or soot-like particles in samples provided to his lab

necessitate replacement of all insulation and other porous material in the building and its HVAC system and components, as no methodology or principles were employed, other than by referencing an analogy to fungi, by the witness to reach his conclusion.  Carlson has not attempted to clean porous material following a fire, so his opinion that this task is impossible is unreliable.

## CONCLUSION

For the foregoing reasons, the defendant respectfully requests that the Court grant its motion to limit or exclude the testimony of Neil Carlson.

Respectfully submitted,

HICKMAN GOZA & SPRAGINS, PLLC


By:     /s/ Hal S. Spragins Jr._____
        Dawn Davis Carson (21416)
        Russell B. Jordan (25493)
        Hal S. (Hank) Spragins, Jr. (30360)
        *Attorneys for Southern Trust*
        P.O. Box 16340
        Memphis, TN  38186
        (901) 881-9840

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this date electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record, including:

J. Brandon McWherter, Esq.
Gilbert, Russell, McWherter, Scott, Bobbitt, PLLC
341 Cool Springs Blvd., Suite 230
Franklin TN 37067
bmcwherter@gilbertfirm.com

Clinton H. Scott, Esq.
Gilbert, Russell, McWherter, Scott, Bobbitt, PLLC
101 North Highland
Jackson, TN 38301
cscott@gilbertfirm.com

DATED:  May 31, 2017

/s/ Hal S. Spragins Jr.
Dawn Davis Carson, #21416
Hal S. Spragins, Jr. #30360