**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

NORTHEND INVESTORS, LLC,

    Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　No. 1:16-cv-01137-STA-egb
　　　　　　　　　　　　　　　　　　　　　JURY DEMANDED
SOUTHERN TRUST INSURANCE COMPANY,

    Defendant.

**REPLY TO RESPONSE IN OPPOSITION TO MOTION TO LIMIT OR EXCLUDE
TESTIMONY OF THOMAS IRMITER**

    Defendant Southern Trust Insurance Company ("Southern Trust"), by and through counsel, respectfully submits its Reply to Plaintiff's Response in Opposition to Motion to Limit or Exclude Testimony of Thomas Irmiter (D.E. 86).

**REPLY ARGUMENTS**

    A small fire that occurred in the early morning hours of February 4, 2015 gave rise to this insurance dispute. The fire was extinguished and ServiceMaster was called to begin remediation at the Property. ServiceMaster cleaned the office area, and full operations were resumed the Monday following the fire. Northend's chief manager prevented ServiceMaster from cleaning the warehouse. Both the office area and warehouse have been in continuous use since the fire. To date, Northend has not permitted the cleaning of the warehouse to proceed.

    Northend and Southern Trust have different views on the covered losses and what remediation efforts are needed at the Property. Southern Trust has maintained that the warehouse can be cleaned, just as the office space, and Northend maintains that a complete rebuild of the

Property (with replacement of electrical and HVAC components and insulation and sheetrock) is the only fix. Northend refused cleaning, and the parties never reached an undisputed amount of the loss.[1]

Northend's manager responsible for construction, renovation, facility management, maintenance and corporate real estate, Bob Sebastian, testified that all systems (electrical, HVAC, among others) are working at the Property. Dep. B. Sebastian 9:1-3 (D.E. 88-8). And no employee who works at the Property has stated that they could not work due to anything related to the fire. Dep. B. Sebastian 9:23-10:15 (D.E. 88-8). Lisa McKee, another employee of First Bank, testified that she had no collection of the warehouse ever being cleaned before the fire, other than being swept. Dep. L. McKee 8:16-21 (**Exhibit A**). She also testified that "[i]t smells like a warehouse." Dep. L. McKee 12:2-15 (**Exhibit A**). Northend won't allow the warehouse to be cleaned and simultaneously complains that it still smells from the fire.

Northend's response does not demonstrate that Mr. Irmiter is qualified to testify on the methods and procedures of the laboratories where he sent samples, particularly in light of the discrepancies between the labs. It also does not demonstrate that he is qualified to render an opinion on the electrical or HVAC systems repairs when he reported and testified that he would defer to someone else to make that determination. Dep. T. Irmiter 121:20-122:2 (D.E. 78-8). The Response further does not establish the fit between his findings and the expansive scope of repairs – a complete rebuild of the Property.

---

1 Northend again references the timeframe in which it received a payment on the claim. But that ignores that there was never an undisputed amount on the claim. The parties were and remain in disagreement on an undisputed amount.

In its response, Northend argues that Eric McClure opined that the building cannot be cleaned. Mr. McClure first inspected the Property in 2015 at Southern Trust's request and advised that it could probably be cleaned, stating:

> Q: Okay. And tell me what happened during that meeting.
>
> A: He walked me through the site, and he showed me what had happened and showed me the area. He informed me that another mitigation company had done some cleaning in the office areas and asked me what my opinion was to the feasibility of cleaning the warehouse.
>
> Q: And what did you say?
>
> A: I said it could be cleaned probably. What we like to do is take a test area and see – and make sure that is what the owner would expect before we do anything.
>
> Q: All right. And did he ask you to give him an estimate on doing a test area at that time?
>
> A: Not at that time.
>
> Q: Did he ask you at the time to give him an estimate of – for cleaning the structure?
>
> A: Not at that time.
>
> Q: All right. And so you were of the opinion that the structure could, in fact, be cleaned?
>
> A: I was under the opinion that it could be tested to see if it could be cleaned.
>
> Q: All right. Has that opinion changed?
>
> A: As far as testing it to see if it can be cleaned?
>
> Q: As far as cleaning the structure.
>
> A. Yes. I mean, it could be cleaned.
>
> Q: Do you think the vinly-backed insulation could be cleaned?
>
> A: It could be HEPA-vac'd probably. But I believe in my report that I judged that it's probably pretty brittle and it would destroy it if you put any kind of agitative cleaner on it.

3

Dep. E. McClure 31:8-32:22.[2]

Mr. McClure later prepared an estimate for cleaning the warehouse. And Northend's references to Mr. McClure's testimony do not bolster the testimony from Mr. Willits. There is disagreement between the parties regarding prior damage to the insulation and what is required to be cleaned under the Policy, which is demonstrated by the respective scope of losses presented by each side. But Northend would not permit the warehouse to be cleaned and now complains that Southern Trust has not acted on the claim.

For Mr. Irmiter's opinions on electrical and HVAC system replacements, Northend argues that portions of Mr. Irmiter's deposition were cherry-picked to support exclusion. However, Mr. Imiter's report makes clear that he is not suggesting he is an expert in electrical issues. In his first Report, he suggested: "Licensed Electrician should inspect and evaluate the electrical wiring in the building to determine if repairs or modifications will be needed where all electrical boxes and/or conduit may have soot inside them." Irmiter Report at 15 (D.E. 78-1). And he testified at his deposition that he would simply testimony at the locations where we sampled and have lab results showing various chemical compounds at electrical locations but would not testify as to the effect of those compounds on the wiring or coating or "any of those kinds of things[.]" Dep. T. Irmiter 64:11-65:5 (D.E. 78-8).

Northend's response does not demonstrate that Mr. Irmiter is qualified to testify to the scope of the loss in this case. As outlined in the Southern Trust's motion, Mr. Irmiter is relying on lab results with varying results and which are not supported by expert testimony. Irmiter testified that

---

2 Mr. McClure further testified that his estimate included HEPA-vac'ing the insulation, but he would not guarantee the results of HEPA-vac'ing the insulation and did not believe that it could remove the smoke or soot. Dep. E. McClure 56:5-57:4.

4

Carlson's report identified the presence of soot for level one testing, which prompted him to take additional samples which were sent to two different labs, MicroVision and EMSL – one of which found soot non-detectable in certain samples; but those labs "both have…different methodology[ies]," and no witness has testified to the methods of testing by EMSL or MicroVision. Moreover, Irmiter testified that, in making a determination of whether a building has just smoke damage or whether it's actually soot particles, he "rel[ies] on the – on the labs to make that determination." Dep. T. Irmiter 86:5-19 (D.E. 78-8).. Given that "some of the initial data that came back from EMSL was not triangulating with what Carlson was seeing," and no expert has established the methods used by EMSL (as opposed to MicroVision or Carlson), there is not "fit" between the proffered evidence and opinions proposed by Mr. Irmiter.  With the discrepancy in the results between the lab work from EMSL and MicroVision, Mr. Irmiter stated he would rely on Mr. Carlson and MicroVision, yet Mr. Carlson testified that he was not offering opinions on MicroVision's results and neither has another expert.  And Carlson only testified to his testing, not that of EMSL or MicroVision.  And while Irmiter states that EMSL and MicroVision use "different methods," there is no evidence of reliability of the methodologies and principles of EMSL or MicroVision, which underlies Mr. Irmiter's testimony on the scope of repairs he opines are necessary.  Because Irmiter relied on these reports for his testimony in this case, his opinions are unreliable.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant its Motion to Limit or Exclude Testimony of Thomas Irmiter.

5

        Respectfully submitted,

        **HICKMAN GOZA & SPRAGINS, PLLC**

By:   */s/ Hal S. Spragins Jr.*
       Dawn Davis Carson (21416)
       Russell B. Jordan (25493)
       Hal S. (Hank) Spragins, Jr. (30360)
       *Attorneys for Southern Trust*
       P.O. Box 16340
       Memphis, TN  38186
       (901) 881-9840

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this date electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record, including:

    J. Brandon McWherter, Esq.
    Gilbert, Russell, McWherter, Scott, Bobbitt, PLLC
    341 Cool Springs Blvd., Suite 230
    Franklin TN 37067
    bmcwherter@gilbertfirm.com

    Clinton H. Scott, Esq.
    Gilbert, Russell, McWherter, Scott, Bobbitt, PLLC
    101 North Highland
    Jackson, TN 38301
    cscott@gilbertfirm.com

DATED:  June 22, 2017

       */s/ Hal S. Spragins Jr.*
       Dawn Davis Carson, #21416
       Hal S. Spragins, Jr. #30360